**Cynthia DI SALVO, Plaintiff,**

v.

**The CHAMBER OF COMMERCE OF GREATER KANSAS CITY, Defendant.**

**Civ. A. No. 74CV60–W–3.**

United States District Court, W. D. Missouri, W. D.

May 10, 1976.

As Amended June 22, 1976.

---

846

Arthur A. Benson, II, Kansas City, Mo., for plaintiff.

Arlyn D. Haxton, Dietrich, Davis, Dicus, Rowland & Schmitt, Kansas City, Mo., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT FOR PLAINTIFF AND ORDER DIRECTING COUNSEL TO MEET AND CONFER TO DETERMINE WHETHER A STIPULATION OF A REASONABLE ATTORNEY'S FEE CAN BE REACHED AND TO SUBMIT FORMAL FINAL JUDGMENT

WILLIAM H. BECKER, Chief Judge.

This is an action under Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, United States Code. Plaintiff, a white female university graduate and journalist, claims that defendant, The Chamber of Commerce of Greater Kansas City (hereinafter "defendant"), discriminated against her because of sex in payment of compensation during her employment by the defendant. Plaintiff originally sought back pay, punitive damages, injunctive relief and attorneys' fees. The claims for punitive damages and injunctive relief have been abandoned.

On or about December 1, 1972, plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights under Section 296.010 *et seq.*, V.A.M.S., in which she alleged that defendant was discriminating against her because of sex by refusing to give her equal pay for equal work. Thereafter, within 300 days of the alleged unlawful employment practice, the

Equal Employment Opportunity Commission (hereinafter "EEOC") assumed jurisdiction of the complaint at plaintiff's request. On December 11, 1973, the EEOC notified plaintiff of her right to institute a civil action. This action, filed February 14, 1974, was brought within 90 days after notification of her right to sue was received by plaintiff. Therefore, jurisdiction exists under Sections 2000e–5(e) and (f), Title 42, United States Code.

After completion of pretrial proceedings, a plenary evidentiary trial without a jury was held. Both plaintiff and defendant submitted trial memoranda and proposed findings of fact and conclusions of law.

After a careful review of the controverted factual and legal contentions of the parties, the stipulations of fact, and the evidence presented, the following determinations of the factual and legal issues have been made.

### Findings of Fact

Plaintiff is a female citizen of the United States. She was a resident of the State of Missouri while employed by defendant.

Defendant is a Missouri *pro forma* benevolent corporation chartered in 1909. At all times material, defendant was engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks per year. Defendant's principal place of business is located in Kansas City, Missouri.

On or about May 22, 1972, plaintiff was employed by defendant as Associate Editor of defendant's monthly publication, *The Kansas City Magazine*. Her starting salary was $7,800.00 per year, or $650.00 per month, the same salary that had been paid her female predecessor, Cynthia Hardy.

Prior to her employment, in 1970, plaintiff had received a Bachelor of Arts degree, with a major in journalism, from Pennsylvania State University. Thereafter she acquired related employment experience in journalism, first as a freelance writer for several public relations firms and later, from September, 1971, to May, 1972, as a

copywriter and editor of a weekly newsletter for The American Telephone and Telegraph Company (hereinafter "A.T. & T."). Her duties at A.T. & T. included photography, writing, gathering information and other similar journalistic and public relations work. The parties have stipulated that during her employment by the defendant plaintiff was fully qualified to perform the duties of Associate Editor of a magazine.

Before her employment by defendant, plaintiff was interviewed by two of defendant's executive employees, James Morgan, then Editor of *The Kansas City Magazine*, and Morgan's superior, Robert John, defendant's General Manager of Services. Both were then concerned that plaintiff would later become dissatisfied with her salary. At A.T. & T., plaintiff was earning $795.00 per month. So, at her starting salary of $650.00 per month offered by the defendant, she would receive $145.00 per month less with defendant. However, plaintiff stated she was willing to take the salary reduction to broaden her experience with industrial publications and to obtain name recognition through publication of articles under her personal byline. Both Morgan and John recommended that plaintiff be hired because of her basic writing ability, her willingness to learn professional magazine style writing technique, and her ability and willingness fully to follow the instructions and to perform the assignments of the Editor. The decision to hire plaintiff was made by Richard K. Degenhart, Executive Vice-President of defendant.

Plaintiff testified that at the time she was hired, Morgan assured her that there would be a review of her initial probationary status within three months and implied that a raise in salary might accompany that review. Defendant's Personnel Policies and Procedures Manual provides that new employees are on probationary status for the first three months, at which time a review of the employees job performance is conducted to determine whether the employee should be hired on a permanent basis, continued on a probationary basis, or dis-

charged. However, the Manual does not provide for a salary review at that time.

Plaintiff complained to Morgan during the first two months of her employment, and again in the fall of 1972, about the inadequacy of her salary. After the complaint, in the fall of 1972, John advised her that budgetary considerations precluded salary increases. The evidence shows, however, that in its communications section defendant hired two males, Paul Levy and Wayne Wolfe, in the fall of 1972 at salaries substantially higher than plaintiff's (see Parts C and D, *infra*) and increased the salary of Morgan, plaintiff's immediate superior, effective November 1, 1972.

On November 1, 1972, defendant merged the production of *The Kansas City Magazine* with the Communications, Advertising and "Prime Time" (a national program to enhance the "image" of Kansas City) sections into a single Communications Department. Plaintiff's immediate supervisor, Morgan, became Manager of the Communications Department and continued to serve as Editor of *The Kansas City Magazine*. Thus Morgan assumed increased management responsibility.

In early November, 1972, defendant's Executive Committee was presented with overall salary recommendations for the 1972–73 fiscal year beginning December 1, 1972. The Executive Committee then was concerned that defendant's salaries might not be comparable with salaries for similar positions in private industry. To secure an answer to this question, the Executive Committee commissioned a salary survey to be completed prior to making any decisions regarding the salary recommendations. Salary administrators were appointed to make the salary survey. In mid-November, 1972 they sent questionnaires to all defendant's employees to determine the responsibilities and duties of each employee. After review of the questionnaires and answers, the salary administrators recommended that plaintiff be given a raise of $500.00 per

year from $7,800.00 to $8,300.00. The Executive Committee, however, granted an increase to plaintiff of only $400.00 per year to $8,200.00 effective December 1, 1972.

Despite plaintiff's repeated complaints that her salary was not commensurate with her duties, the salary survey did not include a purpose to determine differences in salaries based solely on sex. It did not expressly include a comparison of the duties performed by defendant's male and female employees to determine whether equal salaries were being paid to employees of each sex for substantially equal duties.

Although plaintiff was disappointed with the amount of her salary increase, she remained with defendant until February 7, 1973, when she voluntarily terminated her employment by defendant and accepted an offer of employment from Valentine-Radford Advertising Agency at an increased annual salary of $9,600.00 as a copywriter.

After plaintiff resigned, James Morgan sought a replacement for the position of Associate Editor. Paul Levy, who was also employed in the Communications Department, testified that Morgan told him that he had interviewed three women for plaintiff's job but that none would accept the position for the salary plaintiff had been paid.[1] Grant Stauffer, an investigator for the Missouri Commission on Human Rights, confirmed that Levy had informed him of Morgan's admission during his investigation in 1973.

After his unsuccessful attempts to find a successor for plaintiff at plaintiff's salary, Morgan interviewed Willard Rand, a male, for the job. Rand was interested but would not accept the position at a salary less than $12,000.00 per year. Because Rand appeared to have had extensive experience in editing and writing for public relations publications, Morgan recommended to Robert John that the position of "Associate Editor" be dropped and that Rand be hired at an annual salary of $12,000.00 as a "Communications Specialist." Morgan obtained

---

1. This statement is admissible as an admission of the defendant made by a managing officer in the course of his employment. Rule 801(d)(2)(D) of the Federal Rules of Evidence. If this statement is not considered, the other findings of fact herein would not be affected.

John's concurrence after arguing that the recently employed Publications Development Specialist in the Communications Department, Wayne Wolfe, was not performing as anticipated; that Sam D. Hales, editor of a weekly newsletter, *The Kansas Citian,* who was 66 or 67 years old, might retire at any time; and that Rand would be available to take on the duties of either if necessary. In a memorandum to Degenhart dated March 9, 1973, Morgan stated that his initial plans were for Rand " . . to take on many of the duties formerly assigned to the Associate Editor of *The Kansas City Magazine,*" and that Rand could handle the duties of the Publications Development Specialist if Wolfe was unable to perform effectively. Upon the recommendations of John and Morgan, Rand was hired at $12,000.00 per year starting March 16, 1973.

The ultimate factual issue on liability in this case is whether defendant discriminated against plaintiff in salary solely because of her sex. A critical issue is whether defendant discriminated in salary between males and females who performed substantially equal work. Resolution of these issues requires analysis of plaintiff's duties in comparison to those of her male successor and other male employees who were paid higher salaries.

## A. *Plaintiff as Associate Editor.*

No formal job description existed for the position of Associate Editor until October or November, 1972. However, the evidence shows that plaintiff's duties involved not only *The Kansas City Magazine,* but also to a lesser degree *The Kansas Citian,* a weekly newsletter for defendant's members, and miscellaneous jobs for other departments as requested or as necessary.

Plaintiff's primary responsibility was *The Kansas City Magazine.* She worked with the Editor, Morgan, in planning future issues usually at least three months in advance. She suggested topics for feature stories; wrote feature articles for the magazine almost every month; and assigned other stories to freelance writers and fol-

lowed up on the assignments to ensure that articles of printable quality were submitted on time. She had primary responsibilities for all regular departments of the magazine which included book reviews, an entertainment calendar, a recipe column, and editorials. She edited, and rewrote as necessary, all copy submitted; worked with the Art Director and Editor on graphic interpretation of stories; was responsible for layout and proofreading of galleys; worked with printers as necessary; and worked with two others in the department on distribution. She responded to all complaints about the magazine by letter. In July, 1972, during Morgan's absence on armed service reserve duty, plaintiff had full responsibility for the magazine. The November 1, 1972, reorganization increased Morgan's administrative responsibilities in other areas and resulted, correspondingly, in plaintiff's assumption of greater responsibilities for the production of the magazine.

Although she was hired specifically as Associate Editor of *The Kansas City Magazine,* plaintiff also assisted Sam Hales with photography, layout and proofreading for the newsletter, *The Kansas Citian.* One or two times, in Hales' absence, Morgan assigned plaintiff full responsibility for producing the newsletter.

Finally, when requested by Morgan or others, if she had time, plaintiff performed miscellaneous tasks such as research on postal regulations, drafting a speech for an employee of the Membership Department, and drafting a letter for defendant and the Law Enforcement Assistance Administration for a project upon which they collaborated.

Because of the nature of her duties, plaintiff was considered an executive rather than a secretarial or clerical employee. She had her own office and business card, was not required to maintain a time card, and attended staff meetings.

## B. *Plaintiff's Successor.*

Willard Rand's prior editorial, writing, and photographic experience was much more extensive than plaintiff's. He had

served as editor of several industrial newsletters, two college magazines, and two suburban weeklies. He had written freelance articles for several newspapers and magazines. He had done public relations work for chambers of commerce and two colleges. Further, he had secured special training and experience in photography.

Despite the intentions of Morgan and John that Rand's duties as "Communications Specialist" would be expanded beyond those performed by plaintiff, the preponderance of the evidence showed that Rand performed no substantial duties beyond those performed by plaintiff. Three employees in the Communications Department testified that they could not remember Rand ever performing any duties other than those performed by plaintiff. These three employees were Paul H. Levy, Prime Time News Specialist; Shirley Jean Montague, Business Manager of *The Kansas City Magazine*; and Ruth Ann Sandifer, a secretary. John himself testified that Rand's primary responsibility was to assist Morgan in producing *The Kansas City Magazine.*

John did testify that Rand was to assist Wolfe in preparation of the "Kansas City Fact Book" and to have some photographic responsibility. However, Montague testified that Rand did not in fact substantially assist Wolfe in preparation of the "Kansas City Fact Book." The evidence does show that defendant's photographic files and equipment were transferred from Hales to Rand, and that following termination of Rand's employment the photographic services previously performed by Rand were undertaken by commercial and freelance photographers and the art director. However, it does not appear that Rand's photographic contributions were any greater than those of plaintiff with the exception of an occasional photograph in *The Kansas City Magazine.* Rand did own some photographic equipment that he used but the value of its use was not substantial.

The evidence therefore shows that plaintiff's duties were at least substantially equal to those performed by Rand. There

was even some credible testimony by the witness Sandifer that Rand did not perform some of the duties performed by plaintiff such as assisting in preparation of *The Kansas Citian.*

C. *Publications Development Specialist— Wolfe.*

Wayne Wolfe, a male, was hired in November, 1972 at an annual salary of $11,-000.00 for the position of Publications Development Specialist. That position was a new one and was created to increase the number of defendant's publications. It was made financially possible by termination of a contract with a local advertising agency. Wolfe, who also worked under Morgan's supervision, had much less writing and public relations experience than plaintiff.

Wolfe's primary responsibility was overseeing the assembly of graphic materials to illustrate facts and statistics for the "Kansas City Fact Book." He also acted as liaison with two volunteer committees of defendant's Board, the Prime Time Graphics Committee and the Speakers Bureau. None of his duties were related to *The Kansas City Magazine*, and his duties were not identical to plaintiff's. Nevertheless, the evidence shows that Wolfe's job involved no more skill, effort, or responsibility than plaintiff's. Indeed, it appears that there were more duties to be performed and responsibilities to be borne in the position of plaintiff than in that of Wolfe.

D. *Prime Time Specialist—Levy.*

Paul Levy, a male, was hired in the fall of 1972 as Prime Time News Specialist which was a second position made financially possible by termination of the contract of the local advertising agency. His annual salary was $12,000.00. When hired, he had had more extensive writing and editorial experience than plaintiff.

Levy's principal responsibility was the Prime Time Program, a project to create a favorable image of Kansas City directed at national and international markets. Levy supplied a New York public relations firm with drafts of articles about economic de-

velopments in Kansas City. The firm in turn supplied the articles to journalists to be used by them in writing stories for other publications. Some of the topics were chosen by the New York public relations firm, while others were developed by Levy on his own initiative and submitted for use at the discretion of the public relations firm. The articles were written in a news reporting style so that they would not appear to have been generated by defendant.

Levy further served as staff liaison with the Prime Time Committee which was made up of several of defendant's members. He also escorted representatives of the news media around Kansas City as necessary or desirable. He had no duties with respect to *The Kansas City Magazine,* but did contribute articles.

Levy's writing responsibilities, although different from plaintiff's do not appear to have required any skills not required of plaintiff in her job. Although he had additional public relations duties as liaison with the Prime Time Committee and as an escort to news representatives, these duties required no more skill, effort, or responsibility than plaintiff's job. The differences were inconsequential. It is therefore concluded that the value of the duties of Levy's position were substantially equivalent to the value of the duties of the plaintiff.

### E. *Editor—Morgan.*

James Morgan's sole responsibility prior to November 1, 1972, was as Editor of *The Kansas City Magazine.* He received an annual salary of $14,600.00. He had received an M. A. in English from the University of Mississippi; served as associate editor of a college publication; and was a book editor for Hallmark Cards, Inc., for which he wrote introductions, dust jackets and greeting cards.

As Editor, Morgan was responsible for budgeting, planning, editing, and all other phases of production of *The Kansas City Magazine.* He also served as liaison to defendant's Magazine Volunteer Committee.

After the November 1, 1972, reorganization, Morgan was Manager of the newly formed Communications Department and received a salary increase to $16,000.00 per year. As a result of the reorganization, he acquired additional supervisory responsibility over Wolfe, Levy, Hales, the Advertising and Business Manager for *The Kansas City Magazine,* and some additional clerical employees.

As Editor, Morgan earlier had delegated a substantial amount of the work involved in *The Kansas City Magazine* to plaintiff. He delegated to plaintiff even more responsibilities after the reorganization because of the additional duties he then assumed. While the differences between the duties of the Editor-Manager and Associate Editor were not great, Morgan nevertheless exercised substantially greater managerial and supervisory responsibilities. It is therefore found that the positions of Morgan were not substantially equivalent to plaintiff's lesser position.

### *Conclusions of Law*

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, Section 2000e–2(a)(1), Title 42, United States Code, provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

Section 703(h) of Title VII, Section 2000e–2(h), Title 42, United States Code, provides in pertinent part:

"(h) . . . It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29."

Section 206(d)(1), Title 29, United States Code, known as the Equal Pay Act of 1963, provides in pertinent part:

"(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measure earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . ."

■ Determination of plaintiff's Title VII claim requires analysis of two considerations. First, plaintiff has the initial burden of establishing that defendant discriminated against her in compensation on the basis of her sex. If plaintiff fails to carry that burden, the inquiry ends and the defendant prevails. Second, if discrimination is proven, the burden shifts to defendant to show that a bona fide occupational qualification reasonably necessary to the operation of the business justifies the discriminatory practice. *Knott v. Missouri Pacific Railroad Company*, 527 F.2d 1249 (8th Cir. 1975); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409 (8th Cir. 1975); *Causey v. Ford Motor Company*, 516 F.2d 416 (5th Cir. 1975); *Holthaus v. Compton & Sons, Inc.*, 514 F.2d 651 (8th Cir. 1975).

■ The provisions of Title VII of the Civil Rights Act of 1964 regarding discrimination in compensation based on sex are construed *in pari materia* with the Equal Pay Act of 1963, Section 206(d), Title 29, United States Code. *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166 (5th Cir. 1975); *Ammons v. Zia Company*, 448 F.2d 117 (10th Cir. 1971). *See also: Peltier v. City of Fargo*, 533 F.2d 374 (8th Cir. 1976); *Hays v. Potlach Forests, Inc.*, 465 F.2d 1081 (8th Cir. 1972); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir. 1970), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

■ In order to establish such discrimination, plaintiff must prove that a wage differential was based upon sex, and that there was the performance of equal work for unequal compensation. *Orr v. Frank R. MacNeill & Son, Inc., supra; Ammons v. Zia Company, supra*. The jobs in question need not be identical, but they must be substantially equal. *Peltier v. City of Fargo, supra; Orr v. Frank R. MacNeill & Son, Inc., supra; Ammons v. Zia Company, supra; Shultz v. Wheaton Glass Co., supra*. Jobs are substantially equal if they require the same effort, skill, and responsibility. *Shultz v. American Can Company—Dixie Products*, 424 F.2d 356, 360 (8th Cir. 1970); Section 800.122 *et seq.*, Title 29, Code of Federal Regulations.

■ The consideration of equal pay standards is based on actual job requirements and performance, not on-job classifications or titles. *Peltier v. City of Fargo, supra; Hodgson v. Miller Brewing Company*, 457 F.2d 221 (7th Cir. 1971).

Considering the evidence in the light of the above legal standards, plaintiff has shown by a preponderance of the evidence that defendant discriminated against her in salary because of her sex.

■ Plaintiff and her male successor Willard Rand performed substantially equal work but Rand was paid a salary $3,800.00 per year greater than plaintiff's. The fact that Rand and plaintiff were not employed at the same time is immaterial because Title VII, construed in light of the Equal Pay Act,

". . . does not require that the jobs being compared be performed simultaneously but encompasses situations where an employee of one sex is hired for a particular job to replace an employee of the opposite sex."

*Peltier v. City of Fargo, supra,* 533 F.2d at 377. Furthermore, the fact that Rand had broader experience, greater photographic skills, or owned photographic equipment is immaterial because the crucial issue is not what skills are possessed, but whether the duties actually performed require or utilize those additional skills. *Peltier, supra.* Finally, the fact that Rand may occasionally have taken photographs for *The Kansas City Magazine* is not determinative because of the infrequency and relative insubstantiality of that activity in relation to his other duties and because Rand's additional photographic activities were more than offset by plaintiff's extra work. *Peltier, supra; Brennan v. Prince William Hospital Corporation,* 503 F.2d 282 (4th Cir. 1974); *Shultz v. American Can Company—Dixie Products, supra; Shultz v. Wheaton Glass Company, supra.*

The evidence that plaintiff's male successor, who performed the same duties, was paid a higher salary than plaintiff is sufficient to prove discrimination in compensation because of sex. However, even if evidence of serial employment is not alone sufficient, there is additional corroborating evidence in this case which when considered with the serial employment renders it sufficient.

In this regard, defendant paid two male employees, Levy and Wolfe, salaries which were respectively $4,000.00 and $3,000.00 higher than plaintiff's for work which was substantially the equivalent of plaintiff's in terms of skill, effort and responsibility. The duties performed by Levy and Wolfe and those performed by plaintiff were not identical. However, all three jobs involved writing and publication of material about the Kansas City area. The additional committee liaison duties of Levy and Wolfe required no more skill or responsibility than the extra work of the plaintiff. *Compare: Orr v. Frank R. MacNeill & Son, Inc., supra.* Even if the differences in the three jobs precluded a finding that the jobs were substantially equal, the grossly disproportionate salaries paid for the difference in duties is evidence of discrimination because of sex.

Further, after plaintiff's resignation, defendant offered plaintiff's job at the same salary to three women who refused the offers because the salary was not commensurate with the effort and responsibility required by the job. After meeting with this response, rather than increasing its salary offer to the women applicants, defendant hired a male at a salary $3,800.00 higher than plaintiff's to perform substantially the same duties under a new title.

Despite plaintiff's repeated complaints that her salary was not commensurate with her duties, defendant's wage survey conducted in November and December, 1972 did not include elimination of differences in salary based solely on sex. By limiting the scope of the survey to comparability of salaries with private industry, defendant demonstrated an insensitivity to its legal obligations to avoid discrimination in compensation on the basis of sex.

Defendant has emphasized the fact that plaintiff agreed to accept a salary reduction of $145.00 per month when she accepted defendant's offer of employment. However, whether plaintiff agreed to the salary reduction is immaterial because such an agreement is not a defense to a charge of employment discrimination. An offer of employment cannot be conditioned on a waiver of rights accorded by Title VII. *United States v. Allegheny-Ludlam Industries, Inc.,* 517 F.2d 826, 858 (5th Cir. 1975). The fact that a woman may be willing to work for less than a man is not a valid basis for discrimination in compensation. *Brennan v. Victoria Bank and Trust Company,* 493 F.2d 896, 902 (5th Cir. 1974).

Because plaintiff met her burden of proving discrimination, the burden shifted to defendant to prove that one of the exceptions in Section 206(d), Title 29, United States Code, was applicable, or that the discrimination was justified in good faith by a sexually neutral occupational classification or circumstance. Defendant sought to prove that the discrimination between the salary paid to plaintiff and the higher salaries paid to her male successor and two fellow male employees in the Communica-

tions Department was justified by differences in job requirements and duties. The defendant has, however, failed to carry its burden because the differences in work requirements were insignificant in terms of skill, effort, and responsibility. Plaintiff is therefore entitled to relief.

### Relief

In the complaint, plaintiff prayed for back pay, punitive damages, injunctive relief against further continuance of the salary differential, and reasonable attorney's fee. The request for injunctive relief has become moot because *The Kansas City Magazine* and the positions of Associate Editor and Communications Specialist are not longer in existence. Plaintiff formally withdrew her prayer for punitive damages on the record prior to trial.

■ However, plaintiff is entitled to an award of back pay and interest, and a reasonable attorney's fee.[2] In the absence of the discriminatory practices described above, plaintiff would have received a salary of $12,000.00 per year plus scheduled increases. She is entitled to receive the difference between this sum and what she actually received. A remaining issue is the

period of time for which back pay is recoverable.

■ The purpose of the back pay award is to make persons whole for injuries suffered because of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Plaintiff has conceded that she is not entitled to back pay after the end of March, 1975, the date she finally obtained employment at a salary in excess of that to which she would have been entitled with defendant. See "Plaintiff's trial Memorandum," P. 4. She is entitled to the difference between what her actual earnings were and the amount to which she would have been otherwise entitled in the amount of $14,074.78[3] and interest at six percent calculated from the end of each period set forth in footnote 3, *supra*.

Defendant contends that plaintiff is not entitled to back pay after June, 1973 when she left her employment with Valentine-Radford to move to Miami, Florida, with her husband who had accepted employment there. Plaintiff testified that she had considered not accompanying her husband to Miami; that she would have stayed in Kansas City had she received the salary to which she was entitled; and that she and

---

**2.** Section 706(g) provides in pertinent part: "[T]he court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . or any other equitable relief as the court deems appropriate."

**3.** The *computation used to arrive at this figure* is as follows:

1. Employment with defendant: nine months at $350 per month (May 22, 1972–February 7, 1973) . . . . . . $ 3,150.00
2. Employed at Valentine-Radford: three months at $200 (February 14, 1973– May 15, 1973) . . . . . . . . . . . . . . . . 600.00

   [$500 annual raise at Chamber on anniversary of her employment, to $12,500 per year] one month at $241.66 (May 15, 1973–June 15, 1973) . . . . . . . . . 241.66
3. No income while seeking employment: two and one-half months at $1,041.66 (June 15, 1973– August 25, 1973) . . . . . . . . . . . . . . 2,604.15

4. Employed at Royal Palm Beach Colony: three months at $141.66 (August 26, 1973–December 1, 1973) . . . . . . 424.98
5. Miscellaneous employment: four months at $1,041.66, less $800 earned (December 1, 1973– April 1, 1974) . . . . . . . . . . . . . . . . . 3,366.64
6. Unemployed one month, seeking employment (April 1, 1974– May 1, 1974) . . . . . . . . . . . . . . . . . 1,041.66

   [a second $500 raise at Chamber on anniversary of employment]
7. Unemployed, three-fourths of a month at $1,083.32 (May 1, 1974–May 24, 1974) . . . . . . . . . . . 812.49
8. Employed at Miami Dade Hospital: ten months at $1,083.32 less $900 per month earned (May 25, 1974–March 31, 1975) . . . . . . . . . . . 1,833.20

   Total back pay . . . . . . . . . . . . . . . . . . . $14,074.78

her husband were divorced after moving to Miami.

 Once plaintiff proved discrimination and established what she contends to be her entitlement to back pay, the burden shifted to defendant to rebut the claim or to mitigate the liability. *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387 (7th Cir. 1975); *N. L. R. B. v. Madison Courier, Inc.*, 153 U.S.App.D.C. 232, 472 F.2d 1307 (1973). Defendant must show that plaintiff failed to earn amounts which she might have earned by reasonable diligence. *Equal Employment Opportunity Commission v. Detroit Edison Co.*, 515 F.2d 301, 315 (6th Cir. 1975); Section 2000e–5(g), Title 42, United States Code. The preponderance of the evidence shows that plaintiff would have stayed in Kansas City had she received a salary of $12,000.00 a year with defendant. There was no evidence that plaintiff failed diligently to seek employment in Miami after she left Kansas City. Plaintiff's decision to move to Miami was a direct result of the discrimination, and therefore does not mitigate defendant's liability.

Plaintiff's counsel is entitled to a reasonable attorney's fee. Section 2000e–5(k), Title 42, United States Code. Counsel for both parties will be directed to meet and confer to determine whether a stipulation of the amount of a reasonable attorney's fee can be reached. If such a stipulation cannot be arrived at, plaintiff's counsel should move for an award of attorney's fees and file with the motion an affidavit regarding the nature of his fee arrangement with plaintiff and his time and expenses.

For the foregoing reasons, it is therefore

ORDERED that counsel be, and they are hereby, directed to meet and confer to determine whether a stipulation of a reasonable attorney's fee can be reached. It is further

CONCLUDED that the plaintiff have and recover, of and from defendant, Chamber of Commerce of Greater Kansas City, the sum of $14,074.78 back pay plus interest at 6% together with her costs herein incurred and expended. It is further

ORDERED and ADJUDGED that the prayer of plaintiff for injunctive relief be, and it is hereby, denied. It is further

ORDERED that plaintiff's counsel be, and he is hereby, directed to submit on notice to defendant a formal final judgment in accordance with these findings and conclusions.