Cynthia DI SALVO, Appellee,

v.

The CHAMBER OF COMMERCE OF GREATER KANSAS CITY, Appellant.

No. 77–1321.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1977.

Decided Jan. 12, 1978.

594

Arlyn D. Haxton, Kansas City, Mo., for appellant; Truman K. Eldridge, Jr. and John A. Vering, III, Kansas City, Mo., on brief.

Arthur A. Benson, Kansas City, Mo., for appellee.

Before MATTHES, Senior Circuit Judge, STEPHENSON, Circuit Judge, and WANGELIN,* District Judge.

STEPHENSON, Circuit Judge.

The Chamber of Commerce of Greater Kansas City (Chamber) appeals from a judgment by the district court[1] holding it liable to Cynthia Di Salvo in damages for sex discrimination in the matter of pay in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. The appellant contends that the district court erred in determining that the Chamber discriminated against Di Salvo in her compensation because of her sex. In addition, appellant argues that the district court's award of back pay and attorney's fees to Di Salvo is excessive. We affirm the district court's order except that the total back pay shall be reduced from $14,074.78[2] to the sum of $13,808.78.

The record reveals that the Chamber, comprised of business firms and individual members, is organized for the purpose of community development and promotion in order to enhance the local economy. One of the operational activities of the Chamber during the relevant period was the publication of a monthly magazine known as the *Kansas City Magazine*. The magazine's staff included the office of associate editor.

On May 22, 1972, appellee Di Salvo was hired by the Chamber as associate editor of the magazine at an annual salary of $7,800. In November of the same year the Chamber hired Paul Levy and Wayne Wolfe for two newly created positions, prime time news specialist and publications development specialist. Levy's salary was $12,000 per year and Wolfe's was $11,000. On December 1, 1972, Di Salvo received a salary increase of $400, making her annual salary $8,200. At approximately the same time, Di Salvo filed a charge of sex discrimination against the Chamber with the Missouri Commission on Human Rights.

On February 7, 1973, Di Salvo resigned from her position as associate editor and accepted an offer of employment from a Kansas City advertising agency as a copywriter at an annual salary of $9,600. In March 1973 the Chamber hired William Rand as a "communications specialist" at an annual salary of $12,000.

The Equal Employment Opportunity Commission assumed jurisdiction of Di Salvo's complaint at her request and on December 11, 1973, notified Di Salvo of her right to institute a civil suit. The instant action, brought under 42 U.S.C. §§ 2000e et seq., was filed within 90 days after the above notification. After hearing the evidence the district court found that Di Salvo and her male successor Rand performed substantially equal work but Rand was paid a salary $3,800 per year greater than Di Salvo's. Furthermore, the court found that the Chamber paid two male employees, Levy and Wolfe, salaries which were respectively $4,000 and $3,000 higher than Di Salvo's for work which was substantially the equivalent of Di Salvo's in terms of skill, effort and responsibility.

42 U.S.C. § 2000e–2(a)(1) provides in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to * * * discriminate against any individual with respect to his compensation * * * because of such individual's * * * sex * * *.

42 U.S.C. § 2000e–2(h) provides in part:

(h) * * * It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is autho-

---

* The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable William H. Becker, Chief Judge, now Senior District Judge, United States District Court for the Western District of Mis-

souri. Findings of Fact and Conclusions of Law are reported at 416 F.Supp. 844 (W.D.Mo. 1976).

2. The district court's computations are set out at 416 F.Supp. at 854 n.3.

rized by the provisions of section 206(d) of Title 29.

29 U.S.C. § 206(d)(1), the Equal Pay Act of 1963 (the Act), provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions * * *.

■ We note at the outset that the provisions of Title VII regarding sex discrimination in the area of compensation must be construed in harmony with the Equal Pay Act. *Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166, 170 (5th Cir.), *cert. denied*, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975); *Ammons v. Zia Co.*, 448 F.2d 117, 119 (10th Cir. 1971); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 266 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); *Usery v. Bettendorf Community School District*, 423 F.Supp. 637, 639 (S.D. Iowa 1976); *Howard v. Ward County*, 418 F.Supp. 494, 503 (D.N.D.1976).

This court in *Katz v. School District of Clayton, Missouri*, 557 F.2d 153, 156 (8th Cir. 1977), recently stated the following concerning the Act:

A *prima facie* case of violation of the Act is established where it is shown that "the employer [has paid] workers of one sex more than workers of the opposite sex for equal work." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Equal work under the Act means "jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d). * * * [W]e interpret the statute to mean that two employees are performing equal work when it is necessary to expend the same degree of skill, effort and responsibility in order to perform the substantially equal duties which they do, in fact, routinely perform with the knowledge and acquiescence of the employer. The Act cannot be avoided because the job titles of employees are not the same nor is the Act avoided if the official job descriptions of employees specify different duties. "Actual job requirements and performance are controlling." *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 288 (4th Cir. 1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975); *Hodgson v. Daisy Manufacturing Co.*, 317 F.Supp. 538 (W.D.Ark.1970), *modified*, 445 F.2d 823 (8th Cir. 1971) [footnote omitted].

Turning to the instant case, the district court found that Di Salvo's "duties were at least substantially equal to those performed by Rand." *Di Salvo v. Chamber of Commerce of Greater Kansas City*, 416 F.Supp. 844, 850 (W.D.Mo.1976). The district court further noted that there was some credible testimony that Rand did not perform some of the duties performed by Di Salvo. *Id.* Similarly, the district court found that Wolfe's job involved no more skill, effort, or responsibility than Di Salvo's. Again, the district court stated that it appeared that there were more duties to be performed and responsibilities to be borne in Di Salvo's position than in that of Wolfe's. *Id.* Finally, in regard to Levy, the district court found that his writing responsibilities did not require any skills not required of Di Salvo in her job. Although Levy had additional duties, these duties required no more skill, effort or responsibility than Di Salvo's job. The district court concluded that the value of the duties of Levy's position were substantially equivalent to the value of the duties of Di Salvo. *Id.* at 851.

■ The findings of fact by the district court are entitled to great weight and we must accept them unless they are clearly erroneous under Fed.R.Civ.P. 52(a); *Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524 at 526 (8th Cir. 1977); *Ridgway v. United Hospitals-Miller Div.*,

563 F.2d 923 at 927 (8th Cir. 1977). When the record is considered as a whole, it is clear that the district court's findings concerning the substantial equality of the work are not clearly erroneous. We conclude that the trial court's determination that Di Salvo had established by a preponderance of the evidence that the Chamber discriminated against her in salary because of her sex is supported by substantial evidence.

The district court properly noted that because Di Salvo met her burden of proving discrimination, the burden shifted to the Chamber to justify the difference in compensation by reference to one or more of the exceptions appearing in the Act. *Di Salvo v. Chamber of Commerce of Greater Kansas City, supra,* 416 F.Supp. at 853. Once again when the record is considered as a whole, we are satisfied that the district court's conclusion that the Chamber failed to carry its burden is supported by substantial evidence. The only remaining question concerns the propriety of the relief granted to Di Salvo.

■ The district court, in computing the amount of Di Salvo's back pay, indicated that in the absence of the Chamber's discriminatory practices, Di Salvo would have received a salary of $12,000 per year plus scheduled increases.[3] The district court stated that Di Salvo was entitled to receive the difference between the above figure and what she actually received. The Chamber contends that the back pay calculation of the district court does not take into consideration the increase in salary granted to Di Salvo by the Chamber of $400 per year effective December 1, 1972. In addition, the Chamber contends that the district court's calculation does not take into account the bonus of $400 which Di Salvo earned as interim income with the advertising agency in Kansas City. We agree with the Chamber and accordingly reduce the total back pay from $14,074.78 to $13,808.78.[4]

The Chamber further argues that the district court erred in its determination of the back pay period. The end of the time period for which back pay was recoverable was determined by the district court to be March 31, 1975, the date Di Salvo obtained employment at a salary in excess of that to which she would have been entitled with the Chamber. The Chamber argues that Di Salvo's back pay should have been terminated on June 15, 1973, when Di Salvo quit her employment at an advertising agency in Kansas City in order to move to Miami, Florida. The Chamber contends that Di Salvo's decision to move from Kansas City to Miami was made voluntarily for the personal reason of joining her husband rather than any mitigative motives and, therefore, back pay for all subsequent periods should have been denied.

■ In addressing this question it is appropriate to consider decisions of the National Labor Relations Board inasmuch as the back pay provisions of Title VII were expressly modeled on the back pay provisions of the National Labor Relations Act. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In *Nabors v. NLRB,* 323 F.2d 686, 692–93 (5th Cir. 1963), *cert. denied,* 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964), the Board's decision that no back pay should be allowed a former employee who quit his subsequent job for personal reasons was upheld. The court did, however, note that the back pay should resume when the employee obtained another job. Similarly, in *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir. 1966), a Board ruling that no back pay should be allowed a former employee who unjustifiably quit two subsequent jobs was affirmed. In *Mastro*

---

3. Although the Chamber argues that the scheduled increases were not automatic but rather were based on merit and discretionary with management, we do not believe the district court erred in adding two $500 annual increases to the back pay calculation. The record contains some evidence that the increases were given by the Chamber with little regard to merit.

4. The Chamber salary increase is $33 per month, for a total of $66; adding one-half of the $400 bonus ($200) totals $266. Appellee took no exception to this reduction in her brief.

*Plastics Corp.,* 136 N.L.R.B. 1342 (1962), the Board was faced with a back pay issue wherein a former employee had decided voluntarily to terminate her subsequent job and move with her husband beyond the vicinity of the labor market. The Board indicated that a claimant may seek a job beyond the vicinity of the labor market and still be entitled to back pay. The Board held, however, that the claimant had left her subsequent job for a reason other than seeking a new job and further that the claimant would have also left her original job. Under those circumstances the Board disallowed back pay to the claimant from the time of the move.

■ Turning to the instant case, the district court found that Di Salvo would have stayed in Kansas City had she received a salary of $12,000 a year with the Chamber. In this regard Di Salvo testified that she considered staying in Kansas City even after her husband had taken a job in Miami, Florida. Di Salvo additionally stated that she was extremely discouraged by her experience at the Chamber and considered Miami a new start. She felt that Kansas City did not offer much room for advancement in the field of magazine journalism and that her "salary progress in general in Kansas City had been awful." On cross-examination as well as redirect, Di Salvo reiterated that there was a real possibility of her staying in Kansas City even after her husband had taken a job in Miami, Florida. She finally testified that she and her husband were divorced after moving to Miami.

After reviewing the evidence we cannot say that the district court's finding that Di Salvo would have stayed in Kansas City had she received a salary of $12,000 a year with the Chamber is clearly erroneous. If we were the triers of the fact we might conclude that Di Salvo's move to Miami was at least partially based on her personal decision to join her husband. However, the trial court could better weigh the credibility of Di Salvo's testimony that she considered

staying in Kansas City; that in view of her lack of progress in Kansas City she felt Miami was a fresh start with greater opportunity for furthering her career; that she immediately sought employment in Miami and was partially successful. Furthermore, the record reveals that in less than two years she was earning over $13,000, thus terminating any claim for back pay after April 1, 1975. We conclude that there is adequate evidence in the record warranting the district court's determination that Di Salvo's move to Miami was based on mitigative motives and that the termination date for calculating her back pay was March 31, 1975.

■ One of the purposes of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 418, 95 S.Ct. 2362. We also note the Supreme Court's observation "that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." *Id.* at 421–22, 95 S.Ct. at 2373. Once plaintiff in a Title VII case such as this has proven her case and established what she contends to be her damages, the burden of going forth to mitigate the liability or to rebut the damage claim rests with the defendant.[5] *Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 392 (7th Cir. 1975). *See also NLRB v. Madison Courier, Inc.,* 153 U.S. App.D.C. 232, 242–246, 472 F.2d 1307, 1317–21 (1972).

> In summary the district court held:
> There was no evidence that plaintiff failed diligently to seek employment in Miami after she left Kansas City. Plaintiff's decision to move to Miami was a direct result of the discrimination, and therefore does not mitigate defendant's liability.

*Di Salvo v. Chamber of Commerce of Greater Kansas City, supra,* 416 F.2d at 855. We are not persuaded that the district court erred in so holding.

---

5. 42 U.S.C. § 2000e–5 provides that "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminat- ed against shall operate to reduce the back pay otherwise allowable."

Finally, the Chamber contends that the district court erred in determining that Di Salvo was entitled to $11,505 in attorney's fees and $523.28 in costs and expenses.[6] The Chamber argues, more specifically, that the district court increased a base fee by 25% without any supporting reasons or evidence. Contrary to this argument, however, the district court, in accordance with *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974),[7] discussed several factors in its adjustment of a base fee figure. Reasons for the 25% adjustment included the skills of the plaintiff's attorney required to perform the legal service properly the particular fee arrangement,[8] and the amount of the judgment and results obtained. We conclude that the award of $11,505 and attorney's fees was not an abuse of discretion under the circumstances of this case.

The district court's order is modified in that Di Salvo shall recover from the Chamber the sum of $13,808.78 back pay plus interest at 6% together with her costs. The district court's order is affirmed in all other respects.

6. Costs are normally awarded to the prevailing party, and the award in the instant case is within the sound discretion of the trial court. *See Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50 at 55 (8th Cir. 1977).

7. The guidelines for attorney's fees set forth in *Johnson v. Georgia Highway Express, Inc.*, supra, have been approved by this court. *E. G., Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 884 (8th Cir. 1977).

8. The district court, in its order awarding attorney's fees, stated in part:

Pursuant to the fee arrangement between plaintiff and her counsel, counsel is entitled only to those attorneys fees which may be awarded by the Court. Costs and expenses were advanced by counsel, but plaintiff is obligated to reimburse counsel for costs and expenses not recovered from defendant. Counsel for plaintiff risked the time required to prepare for trial, and for trial, without remuneration if plaintiff had not been successful on the merits.