**SINCLAIR OIL CORPORATION et al.**

v.

**The UNITED STATES.**

No. 160–66.

United States Court of Claims.
March 15, 1968.

**250**

Charles C. MacLean, Jr., New York City, attorney of record, for plaintiffs. Ray I. Hardin, Donal A. Kinney, and Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel.

Mason C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller

and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

LARAMORE, Judge.

Sinclair Oil Corporation, for itself and as the common parent of a group of affiliated corporations,[1] and each member of the group on its own behalf (hereinafter referred to collectively as either plaintiff or Sinclair), filed consolidated Federal corporation income tax returns for the tax years 1955, 1956 and 1957. The group claims a refund of approximately $237,220.81 [2] in taxes which, it alleges, were erroneously assessed. Payments of the deficiency assessments for 1955, 1956 and 1957 were made on March 24, 1961, February 16, 1962, and February 28, 1963, respectively. Sinclair's refund claims were denied, and suit has been timely filed. The parties are before us on their cross-motions for summary judg-

1. The affiliated group (defined in section 1504 of the Internal Revenue Code of 1954, 68A Stat. 369, 370) consisted of: Sinclair Oil Corporation, Consolidated Casualty Insurance Company, Goodall Pipe Line Company, Hughes Oil Company, Idaho Securities Company, Pawnee Pipe Line Company, Republic Production Company, Richfield Oil Corporation of New York, Sherwood Brothers Incorporated, Sinclair Alberta Oil Company, Sinclair Bow Oil Company, Sinclair Calgary Oil Company, Sinclair Canada Oil Company, Sinclair Crude Oil Company, Sinclair Delaware Corporation, Sinclair Edmonton Oil Company, Sinclair Mediterranean Petroleum Company (formerly Sinclair Petroleum Company), Sinclair Oil and Gas Company, Sinclair Pembina Oil Company, Sinclair Petrochemicals, Inc. (formerly Sinclair Chemicals, Inc.), Sinclair Pipe Line Company, Sinclair Refining Company, Sinclair Research, Inc. (formerly Sinclair Research Laboratories, Inc.), Sinclair Somal Corporation, Sinclair Venezuelan Oil Company (formerly Venezu-

elan Petroleum Company), Stoll Oil Refining Company, and The Utilities Company.

2. Plaintiff claims a refund as follows:
1955: Refund of a $29,145.70 deficiency assessment and $8,753.29 interest paid (total of $37,898.99); with interest from the date of payment, March 24, 1961. paid (total $65,952
1956: Refund of a $50,963.52 deficiency assessment and $14,988.88 interest paid (total $65,952.40); with interest from the date of payment, February 16, 1962.
1957: Refund of a $102,819.30 deficiency assessment and $30,551.12 interest paid (total of $133,369.42); with interest from the date of payment, February 28, 1963. There is some confusion over the exact amount claimed for 1957. Plaintiff requests a $133,369.42 judgment, but the deficiency assessment and interest paid total $133,370.42. Moreover, in its brief, it refers to a deficiency of $102,-828.22 and interest paid of $30,554.07, a total of $133,382.29.

ment. We find that the assessment of a deficiency was improper.

The District Director of the Internal Revenue Service for Manhattan, after an audit of Sinclair's 1955 consolidated return, assessed a deficiency based upon his decision that, for the purpose of determining the amount of income exempt from the additional tax imposed upon corporations which file consolidated returns (two percent of consolidated taxable income as provided for in section 1503(a) of the Internal Revenue Code of 1954),[3] the net loss incurred by one exempt member of the group, Sinclair Canada Oil Company, a Western Hemisphere trade corporation (as defined in section 921),[4] must be subtracted from the net profits realized by Sinclair Pipe Line Company and Goodall Pipe Line Company, equally exempt regulated public utilities (as defined in section 1503(c)).[5] Deficiencies were also assessed for the years 1956 and 1957. The District Director decided that the Sinclair Canada Oil Company net loss for 1956 must be

3. All section references are to the Internal Revenue Code of 1954, 68A Stat. 3, unless otherwise specified. The relevant parts of section 1503(b) and (c), 68A Stat. 367–369, were repealed by the Revenue Act of 1964, Pub.L. 88–272, § 234(b) (1), 78 Stat. 113, effective under § 234(c) (78 Stat. 116) for tax years beginning after December 31, 1963. During the years in question those sections read as follows:
"Sec. 1503. COMPUTATION AND PAYMENT OF TAX.
"(a) GENERAL RULE.—In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 * * *; except that the tax imposed * * * shall be increased for any taxable year by 2 percent of the consolidated taxable income of the affiliated group of includible corporations. * * *.
"(b) LIMITATION.—If the affiliated group includes one or more Western Hemisphere trade corporations (as defined in section 921) or one or more regulated public utilities (as defined in subsection (c)), the increase of 2 percent provided in subsection (a) shall be applied only on the amount by which the consolidated taxable income of the affiliated group exceeds the portion (if any) of the consolidated taxable income attributable to the Western Hemisphere trade corporations *and regulated public utilities included in such group.* [Emphasis supplied.]
"(c) REGULATED PUBLIC UTILITY DEFINED.—
"(1) IN GENERAL.—For purposes of subsection (b), the term 'regulated public utility' means—
 * * * * *
"(C) A corporation engaged as a common carrier * * * (ii) in the furnishing or sale of transportation of oil

or other petroleum products (including shale oil) by pipe line, if subject to the jurisdiction of the Interstate Commerce Commission * * *."
 Treasury Regulation § 1.1502–30(b) (1), 26 C.F.R. 174, issued in 1955 to clarify the application of section 1053(b), reads as follows:
"(1) *In the case of Western Hemisphere trade corporations and regulated public utilities.*—If the affiliated group filing a consolidated return includes a Western Hemisphere trade corporation, * * * *or* a regulated public utility, * * * the increase of 2 percent * * shall be applied only on that portion of the consolidated taxable income attributable to the members of the group other than the Western Hemisphere trade corporation *or* the regulated public utility * * *. [Emphasis supplied.]"

4. Section 921, 68A Stat. 290, defining a Western Hemisphere trade corporation, reads as follows:
"Sec. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.
"For purposes of this subtitle, the term 'Western Hemisphere trade corporation' means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

 * * * * *

"[95% of gross income for the three years next preceding the close of the taxable year is from sources outside of the United States and 90% of gross income for that period is from a trade or business.]"

5. See n. 3, supra, for the definition of a regulated public utility in section 1503 (c).

deducted from the total net income for 1956 realized by Sinclair Pipe Line Company, Pawnee Pipe Line Company (a regulated public utility) and Goodall Pipe Line Company. For 1957, Sinclair Canada Oil Company's net loss was similarly subtracted from the net income of Sinclair Pipe Line Company for purposes of section 1503(a).

In each year, to determine the base amount of income to which it applied the two percent tax, Sinclair had deducted the full regulated public utility net taxable income from consolidated taxable income, without first subtracting the losses of the Western Hemisphere trade corporation. The net loss of the only Western Hemisphere trade corporation in the affiliated group, the District Director concluded, must be subtracted from the net income realized by any exempt regulated public utility in the group. The result of that calculation, he found, is the only amount exempted from the consolidated taxable income of the group otherwise subject to the two percent tax. To the extent that the loss, when deducted, reduced the exempt net income of the regulated public utilities, a corresponding increased amount of consolidated taxable income was subject to the tax. The two percent tax assessed on that amount of additional consolidated income is the tax for which Sinclair now claims a refund.

Sinclair's refund claim for each year is based solely upon the ground that section 1503(b) exempts net income earned either by regulated public utilities or by Western Hemisphere trade corporations within the group, but does not limit the exemption to the "net" of regulated public utilities' income measured against Western Hemisphere trade corporations' losses. Net losses from one category, plaintiff contends, are not subtracted from net profits of the other category.

To determine if there is any net income earned by a class, losses and profits of all corporations within the class are netted, but the results of those intra-class calculations are not netted against each other.

■ Defendant argues that the statutory use of the word "and" in section 1503(b) (rather than the word "or"), is a clear indication that the only exempt amount is the income, if any, of the combined profits and losses of both classes. In essence, therefore, we must decide if Congress, by adopting the conjunctive word "and" to introduce the regulated public utility class of excludable income into section 1503(b), intended to merge two classes of unrelated exempt income into one exemption; or, on the other hand, if it intended to exempt income earned by one class apart from a profit or loss of the other class. Our examination of the legislative history (of which there is a dearth of pertinent material), of the impelling motivation for the enactment of each exemption, and of the specific wording of section 1503(b) leads us to conclude that Congress intended to create two independent classes of exempt income, each of which is autonomously exempted from the amount of consolidated taxable income of the affiliated group subject to the two percent additional tax.

The policy motivations for enacting each exemption are clearly unrelated. In 1950, Congress enacted the two percent additional tax on affiliated corporations filing consolidated returns. It was thought that this additional tax burden would adversely affect American investments in Latin America. Therefore, an exemption for Western Hemisphere trade corporations was enacted.[6] The exemption for regulated public utilities, however, was first promulgated in 1954, some four years later. In adding this exemp-

---

6. The Western Hemisphere trade corporation exemption was enacted by amendment to section 141(c) of the Internal Revenue Code of 1939 (the predecessor of section 1503(b) of the Internal Revenue Code of 1954) in the Revenue Act of 1950, ch. 994, § 121(f),

64 Stat. 918. For a discussion of the desirability of a Western Hemisphere trade corporation exemption see: Hearings Before the Senate Committee on Finance on Revenue Revisions of 1950, 81st Cong., 2d Sess., 859-861 (1950).

tion Congress sought to relieve the regulated public utilities from a tax burden to which they were often subject only because state regulation made it necessary for them to operate in the form of separately incorporated subsidiaries. This purportedly unfair additional two percent tax burden resulted in the enactment of a second class of exempt income.[7]

Each class was granted exempt status after having been separately considered. Defendant's insistence that the word "and" necessarily created one exempt class of income is not persuasive in the absence of any congressional statement that it intended to provide for only one net amount of exempt income. The implicit objective of these provisions, which we attribute to Congress, was to create two separate classes of exempt income.

Neither party disputes the fact that different considerations motivated the enactment of each exemption. Nor do they contest the propriety of the accepted rule that losses and profits of all corporations within each class must be netted to determine if there is any income of a class which might be subject to the exemption. At issue, however, is whether net losses of one class may be ignored, and the full net income of the other class excluded.

The legislative history is inconclusive, but its purport indicates an intent to create two independent classes. When the regulated public utilities exemption was under consideration, Congress was cognizant of the then existing and accepted rule which required the netting of profits and losses to determine if any exempt Western Hemisphere trade corporation net income had been earned. Part of that rule, as explained in the 1950 Senate Report, was that in a situation where the Western Hemisphere trade corporations had a net income of less than zero (i. e., a net loss for the year), the two percent tax was imposed on the entire consolidated taxable income, including all losses.[8] For purposes of the exemption, therefore, the loss was effectively ignored.

The 1954 Senate Report explanation of the regulated public utilities exemption states that the new exemption is to be applied "in a manner similar to the provision applicable to Western Hemisphere trade corporations, * * *."[9] There is no statement in either the 1950 or the 1954 Senate Report that is directly concerned with the specific problem now before us.

Defendant argues that the operative rules for Western Hemisphere trade corporations were not affected by the 1954 amendment. We agree and, therefore, as in pre-1954 amendment years, a Western Hemisphere trade corporation or regulated public utility class loss should be ignored for purposes of the amount exempted from the two percent tax. The result, therefore, is a full exemption of net income in either class. Losses in either class affect the consolidated taxable income subject both to the main tax and to the two percent tax.

The language of section 1503(b) supports this interpretation although on its face the statute is ambiguous. The Treasury Regulation, issued in "clarification" of the statute, adds to our uncertainty by its use of the word "or" in place of the statutory word "and." The statute, by its terms, limits the application of the two percent tax to the amount by which consolidated taxable income "[exceeds the] *portion* (if any) of the *consolidated taxable income* attributable to"

---

7. For a discussion of the need for a regulated public utilities exemption see: Hearings Before the Senate Committee on Finance on the Internal Revenue Code of 1954, 83d Cong., 2d Sess. (1954), 1052, 1234, 1287–1288 and 1971–1973. This provision was enacted by the Internal Revenue Code of 1954, § 1503(b), 68A Stat. 368.

8. S.Rep. No. 2375, 81st Cong., 2d Sess., 72 (1950) 1950–2 Cum.Bull. 483, 535.

9. S.Rep. No. 1622, 83d Cong., 2d Sess., 460 - (1954), 3 U.S.Code Congressional and Administrative News, 83d Cong., 2d Sess. (1954), p. 5104.

the exempt categories. [Emphasis supplied.]

Defendant sees the statute as necessarily requiring the netting of net income and losses *between* classes, because losses and profits must be netted *within* one class. Neither the statute nor the legislative history supports that statement. The statute is designed to tax that amount of consolidated taxable income subject to the main tax in excess of the taxable income therein reflected which is attributable to the net income earned by exempt corporations. A loss, in either exempt category, is reflected in the calculation of consolidated taxable income subject to the main tax. It is in that netting procedure where the net loss affects the amount of income subject to taxation. This was the procedure in pre-1954 years when the only exempted income was that of Western Hemisphere trade corporations. To fulfill the congressional directive that "similar treatment" be accorded the regulated public utilities, losses of neither category should affect the amount exempted from the two percent tax. There is no basis for a distinction between an affiliated group in which there are only Western Hemisphere trade corporations and a group in which there are both regulated public utilities and Western Hemisphere trade corporations. In the former grouping, defendant would apply the pre-1954 rule and effectively ignore the loss. In the latter situation, it would require its proposed netting. We cannot see any basis in the statute for that distinction. We find, therefore, that independent and identical treatment for each exempt category is provided for by section 1503. Losses in one class do not affect the exemption whether or not there are profits in the other class of exempt income. To the extent that regulated public utility income is reflected in consolidated taxable income subject to the main tax, it is exempt from the two percent additional tax.

Defendant argues that the losses of a Western Hemisphere trade corporation, which is the only exempt member of the affiliated group, "would fortuitously be allowed to offset the income of other members [of the group] * * *." Therefore, losses by one exempt class, it reasons, should offset income of the other exempt class before offsetting income of non-exempt members of the group. We cannot accept defendant's semantic gymnastics. Losses are accounted for in the determination of consolidated taxable income subject to taxation. Consolidated taxable income is the net of the losses and profits of all members of the group. Losses are deducted neither "fortuitously" nor by virtue of section 1503(b). In calculating consolidated taxable income subject to the main tax, we do not require regulated public utilities first to subtract the losses of a Western Hemisphere trade corporation and then to apply the net income of exempt members to the income of non-exempt members. All losses and profits are netted together. Losses of the Western Hemisphere trade corporation are not subject either to the main tax or to the two percent tax simply because losses are not subject to any tax. Income of the regulated public utility, however, is subject to the main tax but exempt from the two percent tax. There is no need to look to the exemption provisions with respect to the non-taxation of a net loss incurred by an exempt member of the group.

Defendant relies upon Revenue Ruling 61–143, 1961–2 Cum.Bull. 146, as support for its netting procedure. That Ruling was issued in response to a request by Sinclair for advice on the facts in this case. The government's position is based upon the pre-1954 procedure applicable to Western Hemisphere trade corporations. As indicated above, that procedure merely required an intra-class netting to determine if there had been any income for the year. The pre-1954, intra-class netting, however, did not contemplate the netting of two distinct classes of exempt income into one class. We, therefore, reject the Ruling because it is based upon arguments which we have discredited above. The pre-1954 procedure, if properly applied to an affiliated group which includes both regulated public utili-

ties and Western Hemisphere trade corporations (one of which as a class has a loss for the year), permits a full deduction of the exempt net income without subtracting therefrom the loss incurred by the other exempt class of income. Sinclair's deduction in each year was proper, and it is entitled to recover.

Plaintiffs' motion for summary judgment is granted, and defendant's cross-motion is denied. Judgment is entered for plaintiffs with the exact amount of recovery to be determined pursuant to Rule 47(c) (2).