Lois M. WASHINGTON, Plaintiff,

v.

KROGER COMPANY and Retail Store
Employees Union, Local 782,
AFL–CIO, Defendants.

No. 77–0272–CV–W–5.

United States District Court,
W. D. Missouri, W. D.

Jan. 14, 1981.

Amended Opinion March 2, 1981.
See 512 F.Supp. 67.

Samuel I. McHenry, Legal Aid of Western Missouri, Kansas City, Mo., for plaintiff.

Michael F. Delaney, Spencer, Fane, Britt & Browne, Kansas City, Mo., for Kroger Co.

Michael D. Gordon, Kansas City, Mo., for Union.

## OPINION AND ORDER

SCOTT O. WRIGHT, District Judge.

This is a civil action brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Jurisdiction in this Court is premised on 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(4). Plaintiff Lois Washington (formerly Lois Whittaker) is a black female. She was formerly employed by the defendant Kroger Company (Kroger) and was a member of the defendant Retail Store Employees Union, Local 782, AFL–CIO (Union). Plaintiff alleges that during her employment with Kroger she was discriminated against by reason of her race and/or sex in violation of Title VII and, as a result of this discrimination, was denied training, wages, job assignments and employment hours and was eventually discharged by Kroger. She further alleges that she complained to the Union about this discriminatory treatment, but that the Union also discriminated against her because of her race and/or sex and refused or failed to process plaintiff's grievance properly. Plaintiff requests that the Court grant her the following relief: (1) a permanent injunction prohibiting defendants from engaging in discriminatory employment practices against plaintiff because of her race and/or sex; (2) judgment against defendants awarding plaintiff the back pay and fringe benefits to which she would have been entitled if not for defendants' discriminatory treatment; and (3) an award of

reasonable attorney's fees and costs incurred herein.

Shortly before this case went to trial, the defendant Union filed a motion to dismiss. On the day the trial commenced, the defendant Kroger followed suit and also filed a motion to dismiss. The Court advised the parties that these motions would be taken under advisement and ruled with the case. Accordingly, prior to addressing the merits of plaintiff's lawsuit, the Court will dispose of the defendants' separate motions to dismiss.

## I. Defendant Union's Motion to Dismiss

■ Defendant Union contends that plaintiff's action should be dismissed on the ground that plaintiff has failed to satisfy certain jurisdictional prerequisites to a Title VII action. Specifically, Union alleges that plaintiff failed to initiate this suit within ninety (90) days of her receipt of a "right-to-sue" notice. Under Title VII an aggrieved party has ninety days after receiving a right-to-sue notice from the Equal Employment Opportunity Commission in which to commence a private cause of action. 42 U.S.C. § 2000e–5(f)(1). This time limitation has been held to be jurisdictional and, in this circuit at least, it is mandatory that suit be brought within ninety days of receipt of the notification of the right to sue or the district court lacks subject matter jurisdiction over the action. *Shea v. City of St. Paul*, 601 F.2d 345, 347–48 (8th Cir. 1979).

■ In the instant case the EEOC mailed a right-to-sue notice to plaintiff on January 18, 1977. Plaintiff filed the notice in this Court on April 11, 1977 and requested that the Court appoint counsel to represent her in this case. Plaintiff's present counsel was appointed to represent. her and he filed a formal complaint on June 29, 1977, setting forth plaintiff's alleged cause of action. Union argues that the Court does not have jurisdiction to hear this case because plaintiff's formal complaint was not filed within ninety days of her receipt of a right-to-sue notice. Current case law is to the contrary. The Eighth Circuit has held, in *Huston v. General Motors Corp.*, 477 F.2d 1003, 1008

(8th Cir. 1973), that the filing of the right-to-sue notice itself, along with a request for appointment of counsel, "constitutes the bringing of [a] civil action under Title VII." Thus, plaintiff's filing of her right-to-sue notice and request for counsel within ninety days after receiving the notice was sufficient to satisfy Title VII's ninety-day filing requirement. Consequently, Union's motion to dismiss for lack of subject matter jurisdiction is denied.

## II. Defendant Kroger's Motion to Dismiss

■ Defendant Kroger's motion to dismiss also is based on jurisdictional grounds. Under Title VII the EEOC must be given an opportunity to conciliate the dispute before a private suit may be brought and the timely filing of a charge of employment discrimination with the Equal Employment Opportunity Commission is a condition precedent to the commencement of a private cause of action in federal district court. *Tuft v. McDonnell Douglas Corp.*, 517 F.2d 1301, 1307 (8th Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 782, 46 L.Ed.2d 641 (1976). The complaining party must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged act of discrimination, 42 U.S.C. § 2000e–5(e), and if the party fails to make a timely filing, the district court lacks jurisdiction to consider the party's Title VII suit. *Olson v. Rembrandt Printing Co.*, 511 F.2d 1228, 1231 (8th Cir. 1975).

Kroger contends that plaintiff has not complied with the statutory filing requirements. Plaintiff first filed a discrimination charge with the EEOC on October 22, 1970. In this charge plaintiff alleged that Kroger was not paying her wages equivalent to those received by male employees performing the same work and that she was subjected to this discriminatory treatment because of her sex. This charge was still pending before the EEOC when plaintiff's employment with Kroger was terminated on June 24, 1971. More than two years after her discharge, on July 6, 1973, plaintiff filed a second discrimination charge with the EEOC. As the basis for this

charge, plaintiff alleged that Kroger had discriminated against her because of her race or color by failing to promote her to the position of checker/clerk, by failing to provide her with a fair work schedule, and by discharging her.

■ Kroger now contends that since plaintiff's second charge was not filed within 180 days of the last act of discrimination, i. e., the date of plaintiff's discharge, the Court does not have jurisdiction to consider the claims raised in this charge and those portions of plaintiff's complaint relating to the second charge should be dismissed. Kroger further argues that the second charge cannot be considered an amendment to the original charge. The EEOC regulation in effect at the time plaintiff filed her second discrimination charge, 29 C.F.R. § 1601.11(b) (1973), provided as follows:

A charge may be amended to cure technical defects or omissions, including failure to swear to the charge, or to clarify and amplify allegations made therein, and such *amendments alleging additional acts which constitute unlawful employment practices directly related to or growing out of the subject matter of the original charge will relate back to the original filing date.* (emphasis supplied.)

Kroger takes the position that plaintiff's July 6, 1973 charge cannot relate back to the original filing date because the unlawful employment practices alleged in the second charge do not "directly relate to or grow out of" the subject matter of the original charge. The Court does not agree with this narrow interpretation of the regulation. Admittedly, the nature of the discrimination alleged in plaintiff's first charge (unequal pay) and the basis for it (plaintiff's sex) differs from the discrimination (failure to promote and unlawful discharge) and motive (plaintiff's race or color) alleged in plaintiff's second charge. However, as noted in *Vuyanich v. Republic National Bank of Dallas*, 409 F.Supp. 1083, 1089 (N.D.Tex.1976), "[a] lay person who is a member of more than one minority group, and who feels himself discriminated against, may not be able to determine prior to an investigation on what exact basis the discrimination was incurred." In light of this, the Court finds that the July 6, 1973 charge is an amendment to the discrimination charge filed by plaintiff on October 22, 1970, and, accordingly, relates back to the earlier filing date. The Court believes that this holding is consistent with the liberal interpretation generally given the procedural requirements pertaining to layman-initiated proceedings under Title VII. *Huston v. General Motors Corp.*, 477 F.2d 1003, 1008 (8th Cir. 1973); *Camack v. Hardee's Food Systems, Inc.*, 410 F.Supp. 469, 475–76 (M.D.N.C.1976).

Beyond the foregoing, the Court also finds that the defendant will not be prejudiced by treating plaintiff's second charge as an amendment to her original one. Plaintiff's original charge put the defendant on notice that it was accused of certain discriminatory practices and the second charge simply specified additional grounds for plaintiff's claim. Kroger did not contend until the day of trial that plaintiff's second charge was a distinct claim which had not been timely filed, and throughout the pendency of this action Kroger geared its entire defense toward responding to all of the discriminatory practices alleged by plaintiff. Consequently, under the circumstances of this case, it is clear that the defendant will not be prejudiced if plaintiff's second charge is considered an amendment to her original charge. Accordingly, Kroger's motion to dismiss is denied.

### III. *Uncontroverted Facts*

Pursuant to Local Rule 20 of the Western District of Missouri, the parties filed a Standard Pretrial Order No. 2 prior to trial in which they stipulated that the following facts, among others, are uncontroverted and require no proof:

1. Plaintiff, Lois Washington, is a black, female citizen of the United States and the State of Missouri.

2. Defendant Kroger Company was at all times relevant to this action an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e–5 *et seq.*

3. Defendant Retail Clerks Union Local No. 782 was at all times relevant to this action a "labor organization" within the meaning of Title VII, 42 U.S.C. § 2000e–5 et seq.

4. On September 12, 1969, the plaintiff, Lois Marie Washington, filled out a Kroger Company Employment Application.

5. Plaintiff Washington was employed by defendant Kroger from October 13, 1969 to June 24, 1971, in the job classification Clerk (checker).

6. On or about February 1, 1970, plaintiff first became a member of defendant Union.

7. During most of the period of time when plaintiff was employed by defendant Kroger, plaintiff was a member of defendant Union Local.

8. Plaintiff was hired by defendant Kroger under a MA–3 government contract which reimbursed Kroger for hiring and training disadvantaged persons.

9. On two different occasions plaintiff was given a test by defendant Kroger entitled "Test for Retail Store Aptitude—Form W (for women)." Plaintiff first took the test on September 12, 1969 and achieved a score of seventeen (17). Plaintiff took the test again on March 15, 1971 and received a score of 24. The highest possible score was 40.

10. Defendant Kroger does not maintain records which indicate a specific "passing score," but found that persons with scores in the "favorable" and "very favorable" classes were deemed to have "passed" the test.

11. Beginning in or around October, 1970, plaintiff's work hours were reduced by defendant Kroger from 40 hours per week to less than 40 hours per week. This condition continued through the remainder of plaintiff's employment.

12. On January 22, 1971, plaintiff filed a grievance with defendant Union alleging that Kroger had wrongfully reduced her hours below 40 hours per week and alleging other irregularities.

13. In a letter dated May 7, 1971, defendant Union's Business Representative, James M. Miller, requested information from plaintiff which was necessary in order to process her grievance. Plaintiff alleges she did not receive this letter.

14. In a letter dated June 18, 1971, Business Representative Miller again wrote plaintiff requesting information necessary for processing her grievance. The Union received no response and its letter came back marked "returned to sender." Plaintiff left no forwarding address.

15. On June 24, 1971, defendant issued a "notice of separation" to plaintiff. The notice stated that plaintiff was terminated because she had been "written up three times for failure to report to work when scheduled or called in." The notice was signed by Roy Gibson.

16. Plaintiff did not receive cashier's or checker's training at any time during her employment with defendant Kroger.

17. In a letter dated February 3, 1971, the defendant Company responded to the defendant Union's request for test information from plaintiff's personnel file.

18. In a letter dated February 4, 1971, the defendant Company further responded to defendant Union's telephone request concerning tests taken by plaintiff.

19. In a letter dated April 8, 1971, the defendant Company responded to defendant Union's inquiries concerning plaintiff's job assignment and hours.

20. Plaintiff did not file a grievance with defendant Union prior to January 22, 1971.

21. After her termination plaintiff did not at any time file a grievance or in any other manner resort to the grievance procedure outlined in the collective bargaining agreement.

22. Plaintiff's true signature appears on two "constructive advice records" both dated June 10, 1971.

23. On February 9, 1971, plaintiff filed a complaint of employment discrimination, No. E–7029, against defendant Kroger with

the Kansas City, Missouri Department of Human Relations.

24. On October 22, 1970, plaintiff filed a charge of employment discrimination, No. TKC1–0460, against both defendants with the Equal Employment Opportunity Commission. This charge was amended by plaintiff on July 6, 1973.

25. On or about January 18, 1977, the Equal Employment Opportunity Commission, in case No. TCK1–0460, issued a determination to the effect that "there was not reasonable cause to believe that Title VII of the Civil Rights Act of 1964, as amended, had been violated in the manner alleged."

26. On or about January 18, 1977, the Equal Employment Opportunity Commission mailed a "notice of right-to-sue" to plaintiff.

## IV. *Findings of Fact*

This case has been fully tried to the Court and the issues raised in this action are now ripe for decision. Accordingly, after careful consideration of the evidence presented at trial, as well as the exhibits and briefs submitted by the parties, the Court makes the following findings of fact:

1. Plaintiff Lois Washington filed an application for employment with the Missouri Division of Employment Security on or about September 12, 1969. The Division of Employment Security certified that plaintiff was eligible to participate in a federally sponsored employment program which was created to assist members of minority groups and economically disadvantaged persons in gaining employment. Under this program employers who entered into a contract with the United States Department of Labor received a subsidy from the government which partially reimbursed the employer for the cost of the employee's salary. The Department of Labor paid the participating employer a specific amount for each day an eligible employee worked. The subsidy normally was paid only during the employee's first year of employment and thereafter the employee had the same status as any other employee.

2. The Division of Employment Security referred plaintiff to the employment office of the defendant Kroger. Plaintiff was given a "retail store aptitude" test at Kroger's employment office. Roberta Dolinger, who worked in Kroger's employment office during the period in question, testified that all applicants for employment as a checker/clerk were required to take this test. The test consisted of three distinct segments which evaluated the applicant's personality, job interest and mathematical skills. Initially, employment applicants were given only the math portion of the aptitude test and the other parts of the test would not be given unless the applicant achieved a satisfactory score on the math segment.

3. Plaintiff scored seventeen (17) on the math section of the test at the time she applied for employment with Kroger. Forty (40) was the highest possible score and Kroger required prospective employees to attain a minimum score of twenty-seven (27) in order to receive a "satisfactory" rating. Since plaintiff did not satisfy the minimum score, she was not given the remaining two segments of the aptitude test.

4. Although plaintiff did not meet Kroger's minimum requirements for employment as a checker/clerk, she subsequently was employed by Kroger for such a position. Kroger was a participating employer in the aforementioned federally subsidized employment program and, pursuant to a contract entered into with the Department of Labor, had agreed to employ certain disadvantaged persons who could not otherwise meet Kroger's minimum standards for employment. Consequently, plaintiff was employed by Kroger under this federal assistance program and, in accordance with the terms of Department of Labor contract entered into by Kroger, plaintiff was employed by Kroger for the position of checker/clerk (also referred to as a "cashier" position).

5. Plaintiff began her employment with Kroger on October 13, 1969 and was assigned to work at Kroger Store No. 204 located at 5402 East Truman Road in Kan-

sas City, Missouri. The Truman Road store was managed by Roy F. Gibson and plaintiff worked at this store during the entire time she was employed by Kroger. There were no blacks employed as checkers at the Truman Road store during the period of plaintiff's employment. Plaintiff became a member of the defendant Union on or about February 1, 1970 and remained a member of the Union during substantially all of the time she was employed by Kroger.

6. Although plaintiff was employed by Kroger for the position of checker/clerk, plaintiff was never given an opportunity to perform the duties associated with a checker/clerk position. It was Kroger's policy not to permit any employee to work as a checker/clerk unless that person had successfully completed a "checker training" course given by Kroger. This training program consisted of four (4) to sixteen (16) hours of instruction and practical skills exercises under the supervision of a Kroger employee qualified to perform checker duties. The length of the checker training depended on the individual employee's prior experience, if any, as a checker and the ability the employee displayed during the checker training. In order for an employee to receive checker training, the employee had to score a minimum of twenty-seven (27) on the math portion of Kroger's retail store aptitude test. Twenty-seven (27) was the lowest acceptable score and no one received checker training unless they met this basic requirement.

7. The score plaintiff received on Kroger's aptitude test at the time she originally sought employment did not qualify her for checker training. She took the test again in March, 1971 and achieved a score of twenty-four (24). There was evidence that plaintiff received assistance from a fellow employee when she took this test and, as a result, Kroger refused to accept plaintiff's score as a valid indication of her ability. Moreover, since this was less than the minimum acceptable score, plaintiff again was denied checker training. Although the evidence was unclear, apparently plaintiff had taken the retail aptitude test on one previous occasion and failed to attain the minimum acceptable score on this attempt as well.

8. Because plaintiff failed to attain what Kroger deemed to be a satisfactory score on its retail store aptitude test, Kroger refused to give plaintiff the training that would have qualified her for checker/clerk work. Thus, plaintiff was never given the opportunity to perform the duties associated with a checker/clerk position and during her entire employment with Kroger plaintiff worked in either the produce department or the health and beauty aids department. However, despite performing what was generally classified as "stocker" work, plaintiff was paid a checker/clerk's salary which was lower than a "stocker's" salary.

9. When plaintiff commenced her employment with Kroger, she worked a full forty-hour work week. Beginning in or about October, 1970, the number of hours plaintiff was permitted to work was reduced. Kroger's contract with the Department of Labor terminated in October, 1970, and after that date plaintiff's employment with Kroger was no longer subsidized by the federal government. Initially, Kroger reduced plaintiff's hours of work by about sixteen hours per week. This was approximately the number of hours which previously had been reimbursed by the government subsidy. The reduction in hours did not stop there, however, and plaintiff's hours were thereafter periodically reduced so that she was working approximately twelve hours a week at the time of her termination in June, 1971.

10. Under the system utilized by Kroger, each of its stores was allotted a maximum number of monthly work hours for its employees. These hours were further broken down by department so that the produce, dairy, checker/clerk, etc. departments each had a specific number of work hours allotted to them each month. The work schedules of individual employees at a particular store depended on their seniority within a specific department. After Kroger's contract with the Department of La-

bor expired and plaintiff's government subsidy was terminated, plaintiff was awarded work hours based on her seniority within a department. There were a limited number of work hours available in the nonchecking departments in which plaintiff was qualified to work and plaintiff did not have sufficient seniority in these departments to claim enough work hours for a full forty-hour week. Further, although plaintiff was employed in a checker/clerk position, paid a checker/clerk's salary, and had sufficient seniority to claim work hours in the checker/clerk department, plaintiff was denied an opportunity to work these hours due to her lack of checker training. Consequently, during the time plaintiff's work hours were reduced, there were often occasions when Kroger employed white employees on a part-time basis to perform the checker duties which Kroger refused to permit plaintiff to perform. Plaintiff was the only employee at the Truman Road store to have her work hours reduced during the period in question.

11. On January 22, 1971, plaintiff filed a grievance against Kroger with the defendant Union alleging that her work hours had been wrongfully reduced. The Union's business agent, Jim Miller, formally requested information from Kroger regarding plaintiff's grievance. Kroger responded to these requests by generally indicating that the government subsidy under which plaintiff was hired had expired, that plaintiff was not qualified to perform checker duties for which hours were available, and, although plaintiff was qualified to work in other departments, she did not have sufficient seniority to claim work hours in these departments.

12. After receiving Kroger's response, Miller wrote to plaintiff requesting that plaintiff provide the Union with information concerning any Kroger employees who were given checker training without first taking the store aptitude test. Miller's letter, dated May 7, 1971, advised plaintiff that this information was necessary in order to process her grievance. Plaintiff did not respond to this letter, and on June 18, 1971, Miller again wrote to plaintiff requesting that she provide the Union with the information necessary to process her grievance. Plaintiff also failed to respond to the Union's second letter and, pursuant to the Union's normal procedure, plaintiff's grievance was placed in her Union file and no further action was taken by the Union with regard to this grievance.

13. Beginning in June, 1971, after plaintiff's work hours had been substantially reduced, plaintiff was twice reprimanded by Roy Gibson, her store manager, for absenteeism or tardiness. On June 21, 1971, plaintiff failed to report for work as scheduled and Kroger terminated her employment with the company effective June 24, 1971. Plaintiff did not notify the Union of her termination or seek to challenge her dismissal through the Union grievance procedure.

14. Plaintiff's absenteeism and tardiness problems occurred subsequent to Kroger's substantial reduction of her work hours and there was no evidence that plaintiff had absenteeism or tardiness problems prior to the reduction of her work hours. The reduction of plaintiff's work hours was a direct result of Kroger's failure to provide plaintiff with checker training so that she might claim work hours allotted to the checker/clerk department. The reason articulated by Kroger for denying plaintiff checker training, i. e., plaintiff's inability to achieve a satisfactory score on the retail store aptitude test, was a mere pretext and the Court finds that plaintiff was denied checker training and the concomitant opportunity to perform checker duties because of her race and/or sex. The Court further finds that plaintiff's incidents of absenteeism and tardiness were a result of Kroger's refusal to provide her with checker training so that she might claim sufficient work hours to work a normal schedule and a forty-hour work week. Hence, since plaintiff's involuntary dismissal was directly related to Kroger's discriminatory denial of checker training, her dismissal also was improperly based on considerations of race and/or sex.

15. There was no credible evidence adduced to indicate that the defendant Union unlawfully refused or failed to process plaintiff's grievance because of her race and/or sex. There was no evidence introduced to indicate that plaintiff's grievance was processed or handled by the Union in a discriminatory manner. The Union halted its processing of plaintiff's grievance because plaintiff refused to cooperate with or assist the Union in the investigation and processing of her grievance.

16. Kroger ceased operation of its stores in the Kansas City area effective September 11, 1976. No Union employees were transferred to other areas and the Company had no employment to offer any of its former clerks after that date.

### V. *Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter of this litigation.

█ 2. A private, non-class Title VII action such as this one has three stages. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06, 93 S.Ct. 1817, 1823–826, 36 L.Ed.2d 668 (1973); *Vaughn v. Westinghouse Electric Corp.*, 620 F.2d 655, 657 (8th Cir. 1980); *Osborne v. Cleland*, 620 F.2d 195, 198 (8th Cir. 1980). First, plaintiff must establish a prima facie case of impermissible discrimination based on plaintiff's race or sex. Second, defendant must articulate a legitimate, non-discriminatory reason for the alleged discrimination in order to rebut plaintiff's prima facie case. Finally, assuming that defendant has advanced some legitimate, non-discriminatory justification for its alleged discriminatory action, plaintiff "must be afforded a fair opportunity to demonstrate that [defendant's] assigned reason for [its action] was a pretext or discriminatory in its application." *Teague v. City of St. Louis*, 615 F.2d 773, 775 (8th Cir. 1980), quoting from *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 807, 93 S.Ct. at 1826–827.

█ 3. In the typical Title VII action plaintiff satisfies his initial burden of establishing a prima facie case of discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualification.

*McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824. While the foregoing delineates the general test to be applied in Title VII cases in determining whether plaintiff has established a prima facie case of discrimination, "[t]he method suggested in *McDonnell Douglas* for pursuing this inquiry ... was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Thus, the courts have recognized that the *McDonnell Douglas* test of a prima facie case is not capable of literal application in every Title VII case, and that the proof which is required to demonstrate a prima facie case will vary with each factual situation. *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 575–76, 98 S.Ct. at 2949. Essentially, the plaintiff is only required to "show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 703 (8th Cir. 1980), quoting from *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 576, 98 S.Ct. at 2949.

█ 4. In order to rebut plaintiff's prima facie showing of racial discrimination, the employer must prove "that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race.... To dispel the adverse inference from a prima facie showing ..., the employer need only 'articulate some legiti-

mate, nondiscriminatory reason for the employee's rejection.' " *Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 577, 98 S.Ct. at 2950, quoting from *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. The Eighth Circuit has indicated that the burden of articulating a legitimate, non-discriminatory reason for the alleged discriminatory action is the same as proving that the employment decision was based on a legitimate consideration. *Vaughn v. Westinghouse Electric Corp.,* 620 F.2d 655, 659 (8th Cir. 1980). Moreover, the court of appeals has stated:

> [W]hile the burden of persuasion for demonstrating discrimination remains with the employee, the burden of producing evidence of a legitimate reason for the employment practice shifts to the employer. The employer bears the burden of showing by a preponderance of the evidence that the legitimate reason exists factually.

*Vaughn v. Westinghouse Electric Corp., id.; accord, Martin v. The Arkansas Arts Center,* 627 F.2d 876, 879 (8th Cir. 1980).

█ 5. The basic facts surrounding plaintiff's initial employment are undisputed. Plaintiff—because of her low score on the aptitude test—admittedly would not have satisfied Kroger's requirements for a checker position had she sought employment through normal channels. Kroger, however, was a voluntary participant in the federally subsidized employment assistance program through which plaintiff was referred for employment. One of the major goals of the program was to give certain persons (primarily members of minority groups) an opportunity to acquire experience and training in jobs for which they would not otherwise be qualified. By participating in the program and accepting a subsidy, Kroger agreed to waive its minimum score requirement and employ plaintiff as a checker. If Kroger had not waived this qualification, *i. e.,* its satisfactory test score requirement, plaintiff would never have gained employment with Kroger. The Court thus finds that in employing plaintiff for the position of checker pursuant to the federally subsidized employment program, Kroger effectively waived its requirement that plaintiff attain a minimum score of twenty-seven (27) in order to qualify for checker training. Consequently, plaintiff was entitled to receive checker training in the same manner as an employee who had satisfied the normal requirements for checker training.

█ 6. Plaintiff has established a prima facie case of racial discrimination against Kroger in the denial of training, job assignments and employment hours. There were no black checkers at the Truman Road store during the period of plaintiff's employment. Plaintiff, a black, was denied an employment opportunity (checker training) that was afforded to other persons not of the same race. Kroger's refusal to provide plaintiff with checker training also caused plaintiff to be denied other employment opportunities such as job assignments and employment hours. Completion of Kroger's checker training course was a prerequisite to plaintiff performing work as a checker, but by totally precluding plaintiff from checker training, Kroger foreclosed the possibility that plaintiff could work as a checker and thereby avoid the eventual reduction in her work hours.

The Court further finds that plaintiff has established a prima facie case of racial discrimination against Kroger in her involuntary dismissal. Plaintiff's work hours were significantly reduced following the expiration of her government subsidy. She was the only employee at the Truamn Road store whose work hours were reduced. Plaintiff complained to her store manager about the reduction in her work hours and filed a grievance with the Union. She was informed that the reduction in her hours was due to the expiration of her government subsidy and her inability to claim hours that required the employee to be checker-qualified. Her hours continued to be reduced until she was working approximately twelve hours a week by June, 1971. Plaintiff testified that by this time she had become disenchanted with her job because of Kroger's continual refusal to provide her

with checker training and the drastic reduction in her work schedule. Her tardiness and absenteeism problems were a manifestation of this disenchantment and ultimately culminated in her dismissal.

7. Kroger's sole justification for denying plaintiff training, job assignments and employment were plaintiff's unsatisfactory test scores on the retail store aptitude test. But Kroger produced no objective evidence that the minimum score Kroger deemed sufficient to qualify for checker training was in fact directly correlated to an employee's ability to complete the checker training course and satisfactorily perform checker duties. The only evidence on this point was Roberta Dolinger's testimony that a satisfactory test score was required because checkers handled money and engaged in financial transactions with customers. There was no evidence that this test was not discriminatory and properly reflected an employee's potential ability to perform checker work effectively. The failure of defendant Kroger to produce objective comparative factual data to support its contention that persons who had unsatisfactory scores on the aptitude test could not effectively perform checker work leaves this Court with serious doubts as to whether Kroger has adequately rebutted plaintiff's prima facie case. *See, e. g., Burdine v. Texas Department of Community Affairs,* 608 F.2d 563 (5th Cir. 1979), *cert. granted,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980); *East v. Romine, Inc.,* 518 F.2d 332 (5th Cir. 1975). Nonetheless, for purposes of a determination herein, it will be assumed that defendant has met the standard of rebuttal applied in this circuit.

■ The Court further finds that Kroger has sufficiently rebutted plaintiff's prima facie showing of racial discrimination with regard to her dismissal. Defendant has shown that plaintiff had two unexcused incidents of absenteeism or tardiness in June, 1971, and that plaintiff was reprimanded therefor. Following plaintiff's failure to report for work as scheduled on June 21, 1971, plaintiff's employment with Kroger was terminated. Plaintiff's unexcused absences and tardiness constitute legitimate, nondiscriminatory reasons for her termination sufficient to rebut her prima facie case of discrimination.

8. Since the Court has determined that Kroger rebutted plaintiff's prima facie case with regard to the denial of training, job assignments, work hours and dismissal, the Court must further examine the evidence to determine whether Kroger's articulated justifications for its employment decisions were pretextual or discriminatory in practice. *Kirby v. Colony Furniture Co., supra,* 613 F.2d at 703. In the case at bar, the Court finds that plaintiff has shown by a preponderance of the evidence that the reasons given by Kroger for its adverse employment decisions were pretextual and that the denial of employment opportunities and plaintiff's discharge were discriminatorily motivated. The evidence at trial indicated that throughout plaintiff's employment with Kroger she was treated as a "second class" employee. There were no black checkers at the Truman Road store during the period of plaintiff's employment. Although plaintiff was informed that she was hired for a checker position and was paid checker's wages, she was denied checker training and the opportunity to perform checker work. Instead, she was required to perform stock work at a lower pay scale than other stock workers. She was the only employee at the Truman Road store whose work hours were reduced. It seems clear that plaintiff, a member of a racial minority employed under a federal program designed in large part to assist minority persons, was stigmatized from the beginning of her employment with Kroger because of her race and the circumstances under which she gained her employment. Further, immediately after her government subsidy terminated, plaintiff's work hours were significantly reduced. She complained unsuccessfully about the reduction and Kroger's refusal to provide her checker training. As a consequence, her work habits suffered and plaintiff had three incidents of absenteeism or tardiness. These problems were so intricately related to the discriminatory treatment plaintiff received in other aspects of

her employment, that the purported basis for her discharge also was pretextual and discriminatorily motivated.

■ 9. Plaintiff additionally established a prima facie case of racial discrimination against Kroger in the denial of equal pay for equal work. Plaintiff was employed as a checker and was paid the salary of a checker/clerk. Throughout her employment, however, plaintiff performed work generally assigned to persons employed as "stockers." Kroger paid its stocker employees a higher hourly pay rate than checkers, but plaintiff was not paid the higher compensation.

10. Kroger failed to rebut plaintiff's prima facie case of discrimination based on Kroger's refusal to pay plaintiff a stocker's salary for performing stocker work. The evidence indicated that Kroger paid plaintiff checker's wages because that was the lowest pay level in the store's hierarchy. Kroger's witnesses testified that plaintiff was paid the lowest entry level pay rate because she did not meet Kroger's normal employment requirements and was employed pursuant to the federal subsidy program. The Court finds that this is not a legitimate, non-discriminatory basis for paying plaintiff the lower salary. Although plaintiff was not employed in the usual manner, she was entitled to compensation equal to that received by employees performing the same or similar work. Plaintiff's qualifications to perform stock work were not questioned and Kroger's refusal to fairly compensate her for such work was discriminatory.

■ 11. Plaintiff failed to establish a prima facie case of discrimination against the defendant Union. There was no evidence that plaintiff's grievance was processed differently or with less seriousness than any other employee's grievance. There was no evidence that the Union treated plaintiff's grievance as frivolous or breached its duty of fair representation to plaintiff.

## VI. *Plaintiff's Relief*

### A. *Damages*

■ A major purpose of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2632, 2372, 45 L.Ed.2d 280 (1975). Consequently, a successful Title VII litigant is entitled to reinstatement with full seniority benefits and an award of back pay. However, plaintiff is not entitled to back pay for any period during which she was a full-time student, *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir. 1975), and the back pay award must also be reduced by the amount of any interim earnings or unemployment compensation plaintiff received during the relevant time period. 42 U.S.C. § 2000e–5(g).

In the present case plaintiff did not specifically request reinstatement as part of her prayer for relief. Rather, plaintiff prayed that the Court grant her "a permanent injunction enjoining the defendants ... from discriminating against her ... because of her race, and/or sex" and that the Court award her damages "for back pay accrued during said periods of lay-off and reduced hours...." Although not entirely clear, it would appear that plaintiff decided to forego her right to request reinstatement. Further, under the circumstances of this case, reinstatement is not a practical remedy since Kroger closed the last of its stores in the Kansas City area effective September 11, 1976. No Union employees were transferred to stores in other areas and Kroger did not offer employment to any of its former clerks after that date. Hence, the Court finds that reinstatement is not an available remedy in this case and that injunctive relief against Kroger would be inappropriate.

With regard to the amount of plaintiff's back pay award, the parties have entered into a lengthy stipulation setting forth the various pay rates in effect during, and subsequent to, plaintiff's employment with Kroger. The parties also have stipulated to plaintiff's subsequent employment history and plaintiff has indicated, in a sworn affi-

davit, that she has received approximately $6,000 in unemployment benefits since her discharge in June, 1971.

Plaintiff's back pay award consists of the following components:

(1) The Court has determined that defendant's failure to pay plaintiff stocker wages while she performed stock work was discriminatory. Plaintiff is entitled to the pay differential between a stocker and a checker's salary multiplied by the number of hours plaintiff worked. Accurate records reflecting the exact number of hours plaintiff worked do not exist, but a close approximation can be made as follows:

| Period | Approximate Number of Work Days | Work Hours (based on 8-hr. Workday) | Pay Differential During Period | Amount |
|---|---|---|---|---|
| 10/13/69 to 5/2/70 | 150 | 1200 | 4¢ per hr. | $ 48.00 |
| 5/3/70 to 12/11/70 | 160 | 1280 | 8¢ per hr. | $102.40 |
| 12/12/70 to 5/2/71 | 100 | 800 | 15¢ per hr. | $120.00 |

After May 2, 1971, Kroger paid all clerks, including both stockers and checkers, an identical hourly pay rate. The total wage differential denied plaintiff during the period from October 13, 1960 through May 2, 1971 was $270.40.

█ (2) Plaintiff is entitled to back pay for the employment hours she was denied between October 1, 1970 and June 21, 1971, when she was not permitted to claim hours in the checker department. Beginning in October, 1970, plaintiff's work schedule was reduced from 40 hours per week to 24 hours per week. During the latter stages of her employment, plaintiff was only permitted to work approximately 12 hours per week. For purposes of calculating the employment hours denied plaintiff, the Court will assume that plaintiff's work schedule was reduced to 12 hours per week effective May 2, 1971. The parties have stipulated that if plaintiff had been permitted to continue working approximately 40 hours per week,

she would have progressed to a pay rate of $3.87 per hour on or about May 2, 1971. The wages plaintiff lost as a result of being denied employment hours may be computed as follows:

| Period | Checker Pay Rate During Period | Approximate No. of Employment Hours Denied During Period | Wages Lost |
|---|---|---|---|
| 10/1/70 to 11/16/70 | $2.70 per hr. | 100 | $ 270.00 |
| 11/17/70 to 12/10/70 | $2.80 per hr. | 64 | $ 179.20 |
| 12/11/70 to 5/1/71 | $3.155 per hr. | 320 | $1009.60 |
| 5/2/71 to 6/21/71 | $3.87 per hr. | 196 | $ 758.52 |

The total amount of back pay to which plaintiff is entitled because of the reduction in her employment hours between October 1, 1970 and June 21, 1971 is $2,217.32.

(3) Plaintiff also is entitled to an award of back pay for the wages she lost following her dismissal on June 21, 1971. However, because Kroger ceased operations in the Kansas City area on September 11, 1976, plaintiff is not entitled to an award of back pay subsequent to that date. As the Eighth Circuit has noted, "the back pay provisions of Title VII were expressly modeled on the back pay provisions of the National Labor Relations Act," *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 597 (8th Cir. 1978), and under these established principles of back pay computation, "the basis for the back pay award is the amount which the employee discriminated against would have earned *but for* the discriminatory act." *NLRB v. Columbia Tribune Publishing Co.*, 495 F.2d 1384, 1392 (8th Cir. 1974) (emphasis added). Thus, defendant's liability for back pay ended on September 11, 1976, since after that date plaintiff's loss of employment would have been attributable to the cessation of defendant's operations in Kansas City rather than the defendant's discriminatory actions.*

---

* The Court further notes that plaintiff produced no evidence at trial which would indicate that her employment with Kroger would have extended past September 11, 1976 or that she would have been entitled to checker employment at a Kroger store in some other area of the country.

Using the pay rates stipulated to by the parties, plaintiff's gross pay for this period can be computed as follows:

| Period | Hourly Wage | Weekly Wage | No. of Weeks | Gross Wages |
|---|---|---|---|---|
| 6/22/71 – 11/1/71 | $3.87 | $154.80 | 19 | $ 2,941.20 |
| 11/2/71 – 4/29/72 | 4.36 | 174.40 | 26 | 4,534.40 |
| 4/30/72 – 10/28/72 | 4.61 | 184.40 | 26 | 4,794.40 |
| 10/29/72 – 4/28/73 | 4.86 | 194.40 | 26 | 5,054.40 |
| 4/29/73 – 10/27/73 | 5.11 | 204.40 | 26 | 5,314.40 |
| 10/28/73 – 5/4/74 | 5.36 | 214.40 | 26 | 5,574.40 |
| 5/5/74 – 5/3/75 | 5.81 | 232.40 | 52 | 12,084.80 |
| 5/4/75 – 5/8/76 | 6.31 | 252.40 | 52 | 13,124.80 |
| 5/9/76 – 9/11/76 | 6.96 | 278.40 | 18 | 5,011.20 |

The gross back pay to which plaintiff is entitled for the period between June 22, 1971 and September 11, 1976 is $58,434.

(4) Plaintiff stipulated that she was a full-time student at either Penn Valley Community College or the University of Missouri at Kansas City during the years 1973, 1974 and 1975. Back pay cannot be awarded for those periods during which plaintiff was a full-time student and such amounts as she would have earned had she remained a full-time employee at Kroger must be deducted from her gross back pay award. The amounts plaintiff would have earned at Kroger had she not been a full-time student may be computed as follows:

| Period | Hourly Rate | No. of Weeks | Gross Wages |
|---|---|---|---|
| 1/1/73 – 4/28/73 | $4.86 | 17 | $ 3,304.80 |
| 4/29/73 – 10/27/73 | 5.11 | 26 | 5,314.40 |
| 10/28/73 – 5/4/74 | 5.36 | 27 | 5,788.80 |
| 5/5/74 – 5/3/75 | 5.81 | 52 | 12,084.80 |
| 5/4/75 – 12/31/75 | 6.31 | 34 | 8,581.60 |

The total amount plaintiff would have earned as a full-time employee at Kroger between January 1, 1973 and December 31, 1975, and which must be deducted from plaintiff's gross back pay award because of her status as a full-time student, is $35,-074.40.

(5) Plaintiff's gross back pay award must also be reduced by any amounts plaintiff earned subsequent to her dismissal in years other than when she was a full-time student. Plaintiff has stipulated that her earnings in those years were as follows:

| Year | Amount |
|---|---|
| 1971 (following her dismissal) | $ 0.00 |
| 1972 | 880.00 |
| 1976 (estimate of earnings through Sept. 11, 1976) | 7,159.00 |

The total amount of interim earnings which must be deducted from plaintiff's gross back award is $8,039.00.

(6) Any amount that plaintiff received in unemployment benefits must also be deducted from her back pay award. Plaintiff has stated that since her dismissal in 1971 she has received approximately $6,000 in unemployment benefits.

(7) The net back pay award to which plaintiff is entitled may be ascertained in the following manner:

| | |
|---|---|
| Wages lost due to pay differential: | $ 270.40 |
| Wages lost due to reduction in employment hours: | 2,217.32 |
| Wages lost due to plaintiff's termination: | 58,434.00 |
| Gross back pay: | $60,921.72 |
| Less: | |
| Deduction for period plaintiff was full-time student | $35,074.40 |
| Deduction for interim earnings: | 8,039.00 |
| Deduction for unemployment compensation: | 6,000.00 |
| Total deductions: | $49,113.40 |
| Net back pay award | $11,808.32 |

(8) In addition to a back pay award, the Court finds that plaintiff is entitled to an award of prejudgment interest at the rate of 8% per annum. Although an award of prejudgment interest in a Title VII case is discretionary with the trial court, *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir. 1979), it has normally been made in cases arising within this judicial district. *See, e. g., DiSalvo v. Chamber of Commerce*, 568 F.2d 593 (8th Cir. 1978); *Taylor v. Ford Motor Co.*, 392 F.2d 254 (W.D.Mo. 1974). In making this award, the Court also finds persuasive the following comments from *Patterson v. Youngstown Sheet & Tube Co.*, 475 F.Supp. 344, 355 (N.D.Ind. 1979):

It is within the sound discretion of the Court to award prejudgment interest.... Here, this case has now been pending for about eight years. Some of the delay is due to court congestion and

the lack of judicial manpower in this district. Some is chargeable to counsel for all parties. There has been rampant inflation in the United States since 1971 and this Court has therefore determined to award prejudgment interest at the rate of 8% per annum in this case. The simple fact is that Defendant Youngstown has had the use and benefit of these monies for all these years.

B. *Attorney's Fees*

■ Under the provisions of Title VII, the Court in its discretion may award the prevailing party reasonable attorney's fees. 42 U.S.C. § 2000e–5(k). Although the statutory provision describes an award of attorney's fees as discretionary, the cases have made it clear that "a prevailing *plaintiff* ordinarily is to be awarded attorney's fees in all but special circumstances." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978). In this circuit attorney's fees are to be awarded in accordance with the guidelines enunciated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See Firefighters Institute v. City of St. Louis*, 588 F.2d 235, 242–43 (8th Cir. 1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979); *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 599 (8th Cir. 1978). In *Johnson v. Georgia Highway Express, Inc., supra*, 488 F.2d at 717–19, the court listed twelve factors to be considered in determining an appropriate award of attorneys fees: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

In the present case, plaintiff's attorneys have requested attorney's fees totaling $9,740. Plaintiff's lead counsel devoted 149 hours to the preparation and presentation of the case and co-counsel contributed 16 hours. Lead counsel requests compensation for his legal services in the amount of $8,940 based on the number of hours expended on the case multiplied by an hourly rate of $60.00. Co-counsel's legal fees totaled $800 based on 16 hours devoted to the case at $50.00 per hour. The Court finds that these requests for attorney's fees are entirely reasonable.

Lead counsel, a practicing attorney since 1972, is admitted to the bar in the states of Missouri, Kansas and Nebraska, admitted to practice before the United States Courts of Appeals for the Eighth and Tenth Circuits and admitted to practice before this Court. Following law school, lead counsel was awarded a fellowship under the Reginald Heber Smith Fellowship Program. He has been associated with the Legal Aid Society of Western Missouri for the past six years and has specialized in representation of plaintiffs in employment discrimination cases. Since the commencement of his association with Legal Aid, lead counsel has had primary responsibility for more than 90 employment discrimination suits filed in federal district court. Additionally, he has attended legal education programs and seminars pertaining to employment discrimination law and has lectured community organizations on employment discrimination and the law. Co-counsel in this action graduated from law school in 1978 and is admitted to practice before the bars of Missouri and Kansas. She has practiced exclusively in the area of employment discrimination law since January, 1979.

The Court has had the opportunity to observe lead counsel in this case and other employment discrimination cases. An evaluation of lead counsel's skills—based on the trial judge's past experience as a lawyer and his observations from the bench—leads the Court to conclude that his legal work, preparation and general ability are far above the average attorney's in similar

cases. Further, due to the manner in which he has comported himself in other employment discrimination cases before the members of this Court, lead counsel enjoys an excellent reputation in this judicial district as an eminently qualified attorney in employment discrimination matters. In the instant case, counsel encountered difficulties in assimiliating evidence to support plaintiff's case because of the lengthy time lapse between the filing of plaintiff's charge with the EEOC and the issuance of a determination by that agency. Nonetheless, his pretrial and trial preparation was diligent and thorough. And, although plaintiff failed to establish a claim against one of the defendants (the Union), the Court finds that this only minimally detracts from the overall success of plaintiff's case.

Co-counsel's role in this case, by virtue of her limited participation in it, is obviously more difficult to evaluate. Nonetheless, in light of all the circumstances of this case, including the Court's belief that lead counsel conservatively estimated the value of his time in light of similar cases, *see, e. g., Cleverly v. Western Electric Co.,* 450 F.Supp. 507, 511–12, *aff'd,* 594 F.2d 638 (8th Cir. 1979), the Court finds that the number of hours devoted to the case by co-counsel, and her hourly rate, are reasonable. Accordingly, after a consideration of the factors enumerated in *Johnson v. Georgia Highway Express Co., supra,* as applicable to the circumstances of this case, the Court finds that an award of attorney's fees in the amount of $9,740 is reasonable.

 Finally, the Court concludes that plaintiff should be awarded court costs in this action since such costs are normally awarded to the prevailing party. *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50, 55 (8th Cir. 1977).

### VII. *Conclusion*

In accordance with the foregoing opinion and order, it is hereby

ORDERED that judgment be, and is hereby, entered in favor of plaintiff Lois Washington and against defendant Kroger Company in the amount of $11,808.32, plus prejudgment interest at the rate of 8% per annum. It is further

ORDERED that plaintiff be, and is hereby, awarded reasonable attorney's fees in the amount of $9,740 and that costs be assessed against the defendant Kroger Company. It is further

ORDERED that judgment be, and is hereby, entered in favor of defendant Retail Store Employees Union, Local 782, and against plaintiff Lois Washington.